Robert Scott Dreher, SBN 120527
**DREHER LAW FIRM**
835 Fifth Avenue, Suite 202
San Diego, CA 92101
Telephone: (619) 230-8828
Facsimile: (619) 687-0136

Eric J. Belfi
**RABIN, MURRAY & FRANK, LLP**
275 Madison Avenue
New York, NY 10016
Telephone: (212) 682-1818
Facsimile: (212) 682-1892

John G. Emerson, Jr.
Scott E. Poynter
**EMERSON POYNTER LLP**
P.O. Box 164810
Little Rock, AR 72216-4810
Telephone: (501) 907-2555
Facsimile: (501) 907-2556

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREGORY WATTERSON, Derivatively, On Behalf of RIVERSTONE NETWORKS, INC.,<br><br>               Plaintiff,<br><br>      vs.<br><br>ROMULUS PEREIRA, PIYUSH PATEL, CHRISTOPHER PAISLEY, JORGE A. DEL CALVO, ROBERT STANTON, SURESH GOPALAKRISHNAN and JOHN KERN,<br><br>        Defendants,<br><br>     - and -<br><br>RIVERSTONE NETWORKS, INC., a Delaware corporation,<br>          Nominal Defendant. | Case No.:  C 03-0637 SBA<br><br>SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, AND UNJUST ENRICHMENT<br><br><br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff, by his attorneys, submits this Derivative Complaint (the "Complaint") against the Defendants named herein.

## NATURE OF THE ACTION

1)  This is a shareholder derivative action brought by a shareholder of Riverstone Networks, Inc. ("Riverstone" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy Defendants' violations of common law, including breaches of fiduciary duties, abuse of control, gross mismanagement, and unjust enrichment between August 2001 and June 2002 (the "Relevant Period") which have caused substantial losses to Riverstone and other damages, such as to its reputation and goodwill.

## JURISDICTION AND VENUE

2)  This Court has jurisdiction over all causes of action asserted herein based 28 U.S.C. §1332 and Federal Rule of Civil Procedure 23.1.

3)  This Court has jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual which has sufficient minimum contacts in California and in this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

4)  Venue is proper in this Court because one or more of the Defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Riverstone occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities which had an effect in this District.

## SUMMARY OF THE ACTION

5) Riverstone is a provider of metropolitan area networking solutions that enable service providers to convert raw bandwith into profitable services over legacy and next-generation infrastructures.

6) During the Relevant Period, Defendants sought to create the impression that Riverstone had the ability to directly enter its target markets with a captive client base.  It claimed, that, through, among other things, its relationship with Hutchinson Global Crossing ("Hutchinson"), it could compete head-to-head with the dominant companies in the industry.  This was a false impression. Prior to its relationship with Hutchinson, Riverstone was having difficulty gaining operational momentum within potentially lucrative Asian markets, and it would not be able to meet its announced earnings and revenue projections.

7) Each Defendant knew that Riverstone would be unable to meet its projected Second Quarter 2002 to First Quarter 2003 revenue and earnings per share ("EPS") targets, unless they manipulated the Company's revenue, earnings, and receivables.  However, because the "appearance" of growth was so critical to Defendants' plan to inflate the price of Riverstone shares to sell their own shares and raise money via a $150 million debt offering, Defendants continued to claim throughout the Relevant Period that Riverstone would meet revenue and EPS projections when, in reality, Defendants knew that Riverstone could not achieve their projections without attempting to fraudulently record revenue by inducing clients who Defendants knew did not have the ability to pay to agree to take delivery of goods and that Riverstone was, in fact, suffering from greater losses.  To reveal the truth would be disastrous to defendants' personal financial interests.  Defendants knew that if they revealed Riverstone's inability to generate legitimate sales growth from customers who could actually pay, Defendants would not reap the financial rewards they expected to receive by selling

their own shares at artificially inflated prices.  In all, the Defendants pocketed  approximately $6.4 million and were able to complete a $150 million debt offering.

## THE PARTIES

8) Plaintiff Gregory Watterson is a citizen of Florida and is, and was at all times relevant hereto, an owner and holder of Riverstone common stock.

9) Nominal defendant Riverstone is a corporation organized and existing under the laws of the State of Delaware with its headquarters located at 5200 Great America Parkway, Santa Clara, California.

10) Defendant Romulus Periera was, at all times relevant hereto, Chief Executive Officer and a director of Riverstone.  Periera is a citizen of California.  Because of Periera's positions, he knew the adverse non-public information about the business of Riverstone, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Periera participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases. During the Relevant Period, Periera sold 105,769 shares of Riverstone stock for proceeds of over $1.8 million.

11) Defendant Piyush Patel was, at all times relevant hereto, Chairman and a director of Riverstone. Patel is believed to be a citizen of New Hampshire.  Defendant Patel was also, at all times relevant hereto, Chairman, President, CEO, and a director of Cabletron.  Because of Patel's position, he knew the adverse non-public information about the business of Riverstone, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents,

conversations, and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Patel participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases.  During the Relevant Period, Patel sold 258,542 shares of Riverstone stock for proceeds of over $3 million.

12) Defendant Eric Jaeger is, and at all times relevant hereto was, a director of Riverstone. Jaeger is believed to be a citizen of California. He retired as a director in July 2002.  During the Relevant Period, Jaeger sold161,904 shares of Riverstone stock for proceeds of over $1.3 million.

13) Defendant Christopher Paisley is, and at all times relevant hereto was, a director of Riverstone. Paisley is a citizen of California.

14) Defendant Jorge A. del Calvo is, and at all times relevant hereto was, a director of Riverstone. Calvo is a citizen of California.

15) Defendant Robert Stanton was, at all times relevant hereto, Chief Financial Officer of Riverstone.  Because of Stanton's position, he knew the adverse non-public information about the business of Riverstone, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management meeting, and via reports and other information provided to her in connection therewith.  During the Relevant Period, Stanton participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases. During the Relevant Period, Stanton sold shares of Riverstone stock for proceeds of over $650,000.

16) Defendant Suresh Gopalakrishnan was, at all times relevant hereto, Executive Vice President of Riverstone.  Because of Gopalakrishnan's position, he knew the adverse non-public information about the business of Riverstone, as well as its finances, markets, and present and future

business prospects, via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management meetings, and via reports and other information provided to her in connection therewith. During the Relevant Period, Gopalakrishnan participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases. During the Relevant Period, Gopalakrishnan sold shares of Riverstone stock for proceeds of over $623,000.

17) Defendant John Kern was, at all times relevant hereto, Executive Vice President of Riverstone. Because of Kern's position, he knew the adverse non-public information about the business of Riverstone, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management meetings, and via reports and other information provided to her in connection therewith. During the Relevant Period, Kern participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases. During the Relevant Period, Kern sold shares of Riverstone stock for proceeds of over $472,000.

18) The Defendants identified in ¶¶ 10-15 are referred to herein as the "Director Defendants." The Defendants identified in ¶¶ 10, 16-18 are referred to herein as the "Officer Defendants." The Defendants identified in ¶¶ 10-12, 16-18 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants, and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

19) By reason of their positions as officers, directors, and/or fiduciaries of Riverstone and because of their ability to control the business and corporate affairs of Riverstone, the Individual Defendants owed Riverstone and its shareholders fiduciary obligations of trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage Riverstone in a fair, just,

honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Riverstone and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

20)  Each director and officer of the Company owes to Riverstone and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

21)  The Individual Defendants, because of their positions of control and authority as directors and/or officers of Riverstone, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial, and directorial positions with Riverstone, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and improper representations of Riverstone.

22)  At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Riverstone, and was at all times acting within the course and scope of such agency.

23) To discharge their duties, the officers and directors of Riverstone were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Riverstone were required to, among other things:

///

(a)   refrain from acting upon material inside corporate information to benefit themselves;

 (b)  ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)  conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)   properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)  remain informed as to how Riverstone conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)  ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

24) Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the

Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Riverstone, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders which the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of Riverstone's Board during the Relevant Period.

25) The Individual Defendants breached their duties of loyalty and good faith by allowing Defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of Defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action law suits which allege violations of federal securities laws. As a result, Riverstone has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a) Costs incurred to carry out internal investigations, including legal fees paid to outside counsel;

(b) Costs incurred in investigating and defending Riverstone and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

26) Moreover, these actions have irreparably damaged Riverstone's corporate image and goodwill. For at least the foreseeable future, Riverstone will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and

have misled the investing public, such that Riverstone's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

27) In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

28) During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct which was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow Defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at Riverstone and the profits, power and prestige which the Individual Defendants enjoyed as a result of these positions; and  (iii) deceive the investing public, including shareholders of Riverstone, regarding the Individual Defendants' management of Riverstone's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials which had been misrepresented by Defendants throughout the Relevant Period.  In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

29) The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct commencing by at least mid 2001 and continuing thereafter.  During this time the Individual Defendants caused the Company to conceal the true fact that Riverstone was

misrepresenting its financial results.   In addition, Defendants also made other specific, false statements about Riverstone's financial performance and future business prospects, as alleged herein.

30) The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition, and future business prospects; and to artificially inflate the price of Riverstone common stock so they could: (i) dispose of over $7.8 million of their personally held stock, (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof, and (iii) cause the Company to raise money via a $150 million debt offering.

31) The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results.  Because the actions described herein occurred under the authority of the Board of Directors, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

32) Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

///

**BACKGROUND**

33) On February 10, 2000, Cabletron Systems, Inc. announced its plan to create an independent publicly-traded company, Riverstone Networks, Inc., comprised of Cabletron's Internet infrastructure solutions business for Internet service providers and other service providers. After the completion of Riverstone's initial public offering on February 22, 2001, Cabletron owned 92,088,235 shares of Riverstone common stock, representing approximately 86% of Riverstone's outstanding common stock.

34) On June 3, 2000, Cabletron, Riverstone and certain related parties entered into a Transformation Agreement, and Cabletron and Riverstone entered into a Contribution Agreement. In accordance with the Transformation Agreement, Cabletron transferred to Riverstone the Cabletron-owned assets and liabilities which related to the Riverstone business on August 28, 2000 (the "Contribution" Date"). Zeitnet was also contributed to and then merged into Riverstone.

35) On July 24, 2001, Riverstone issued 7,117,757 shares of common stock to Cabletron in exchange for approximately $122 million in cash and certain strategic investments, with an historic cost of approximately $13 million. Many of Cabletron's top officers and directors became Riverstone's top executives. Indeed, Director Defendant Patel served as Cabletron's Chairman, President and CEO until August 2001.

36) The Company's stated revenue recognition policy generally calls for the recognition of revenue upon <u>shipment</u> of products, provided: there are no uncertainties regarding customer acceptance, persuasive evidence of an arrangement exists, the sales price is fixed and determinable, and collectibility is deemed probable. If uncertainties exist, revenue is recognized when such uncertainties are resolved. Revenues from service and maintenance contracts are deferred and recognized ratably over the period the services are performed, typically twelve months or less. When the Company provides a combination of products and services to a customer, revenue is allocated

based on the fair values.  Estimated costs to repair or replace products that may be returned under warranty are accrued at the time of shipment.  The Company's warranty period typically extends twelve months from the date of shipment.  Sales to customers in which the Company receives an equity instrument as consideration are recorded at the estimated fair value of the instrument received as determined by an independent appraisal or a recent cash equity transaction received by the customer from an unrelated third party.  Deferred revenue is recognized into income when the above criteria have been met.

### FALSE AND MISLEADING STATEMENTS
### DURING THE RELEVANT PERIOD

37)  Defendants made a series of false public statements.  On August 20, 2001, the Individual Defendants caused Riverstone to issue the following press release via *Business Wire*:

Hutchison Global Crossing Selects Riverstone Routers for World's First Metro MPLS Ethernet Network.

Nationwide Network  to Deliver Advanced  Content and IP Services

. . . Riverstone Networks, Inc., a pioneer in metropolitan area networking, today announced that Hong Kong-based Hutchison Global Crossing (HGC) selected Riverstone's advanced routing technology to create the world's first major metropolitan Multi-Protocol Label Switching (MPLS) Ethernet network.  By deploying Riverstone routers to create its metro network, HGC will manage and control bandwidth with unprecedented accuracy to deliver an extensive suite of advanced IP-based services to its customers.  ***The deployment will initially provide nearly one million Hong Kong residents with last-mile Ethernet connectivity***.

"The new Hutchison Global Crossing networks relies on MPLS as the cornerstone for provisioning its services, while leveraging the speed and simplicity of Ethernet, to create an optimal foundation for the profitable delivery of IP services," said Romulus Pereira, president and CEO of Riverstone Networks.  "This state-of-the-art network will facilitate the creation and delivery of several exciting new services, positioning HGC to increase its revenue streams and grow its business into the future."

Riverstone will supply HGC with several hundred metro aggregation routers from the metro core to the access edge, including numerous RS 38000 optical metro backbone routers, which feature powerful service-creation tools and dynamic bandwidth provisioning capabilities.  In addition to using RS 38000 routers in the metro core, HGC will incorporate RS 8600 multi-service metro routers for Point-of-Presence (POP) aggregation purposes, and RS 3000 metro access routers in building access applications.  HGC will also leverage Riverstone technology

to become the first carrier to launch an end-to-end MPLS metro network for content and service delivery.

"This is a very significant metro-optical Ethernet deployment," said David Gross, senior analyst at Communications Industry Researchers, Inc. "MPLS greatly improved traffic engineering in the long-haul IP core, and now Riverstone is leading the charge to bring MPLS to the metro Ethernet core. As service providers are forced to accelerate time to profitability, Riverstone has build a platform that can help them reach their financial objectives."

"Riverstone's vision and strategy have been consistent, and its early commitment to MPLS in its metrowide solutions was well timed to position the company for recent successes in Asia markets," said David Dunphy, senior analyst, Current Analysis. "Rapid buildout of metro networks in placed like Hong Kong, where population density is high and fiber access is widely available, makes for significant opportunities in the current market. Service providers in the region have a large addressable market for new, differentiated, high-bandwidth services, and MPLS technology such as Riverstone's can give these companies an important tool the means to deliver cost-effective Ethernet-based services with consistent service quality."

38) On September 10, 2001, the Individual Defendants caused Riverstone to issue a press release via *Business Wire* which stated in relevant part:

Riverstone Networks, Inc., a pioneer in metropolitan area networking, furthered its lead in Multi-Protocol Label Switching (MPLS) technology for metropolitan area networks by shipping its 1,000th MPLS router port this week.

Riverstone is currently shipping MPLS-enabled routers to six different telecommunications carrier customers. This milestone follows Riverstone's August 2001 announcement that its advanced routers would be used by Hong Kong-based Hutchison Global Crossing to create the world's first metro MPLS network, ***providing nearly one million residents with last-mile Ethernet connectivity***.

39) On September 20, 2001, the Individual Defendants caused Riverstone to issue a press release entitled, "Riverstone Networks Reports Record Revenue, Delivers 169 Percent Year Over Year Growth, and Reaches Profitability Ahead of Expectations." The press release stated in part:

Riverstone Networks Inc. today reported revenues of $55.3 million for its second quarter fiscal 2002, which ended September 1, 2001, a 169 percent increase compared with revenues of $20.6 million for the same period last year and a 25 percent increase compared with revenues of $44.2 million for the prior quarter.

Pro forma net income for the quarter was $1.6 million or $0.01 per share, compared with a pro forma net loss of $8.4 million or $0.09 per share for the second quarter of fiscal 2001, and a pro forma net loss of $3.6 million or $0.03 per share for the prior quarter.

Actual net income for the second quarter, which includes stock-based compensation and amortization of goodwill, was $64,000 or breakeven on a per share basis. This compares with a net loss of $11.8 million or $0.13 per share for the second quarter of fiscal 2001.

"We are very pleased with out financial results," said Romulus Pereira, president and chief executive officer of Riverstone Networks. "Not only did we turn profitable a full quarter ahead of expectations, we grew revenue 169 percent on a year over year basis. We continue to win tier-one accounts around the world by delivering key technology offerings such as MPLS services, new high-density gigabit platforms and high-availability networking solutions. These achievements are establishing us as a premier provider of metropolitan area network equipment."

40) On November 15, 2001, the Individual Defendants caused Riverstone to issue a press release entitled, "Riverstone Sells $150 Million of 3.75% Convertible Subordinated Notes." The press release stated in part:

Riverstone Networks, Inc. announced today that it agreed to privately place $150 million aggregate principal amount of 3.75% convertible subordinated notes due 2006. The notes will be unsecured obligations, convertible into Riverstone Common Stock at a conversion price of approximately $18.16 per share. The company has granted the initial purchasers of the notes a 30-day option to purchase an additional $25 million principal amount of the notes. The placement of the notes is expected to close on November 21, 2001.

41) On December 19, 2001, the Individual Defendants caused Riverstone to issue a press release entitled, "Riverstone Networks Reports Record Third Quarter: Revenues Increase 124% Year Over Year to $60.1 million, Company Reports Pro Forma Profit of $0.03 Per Share." The press release stated in part:

Riverstone Networks, Inc. today reported revenues of $60.1 million for its fiscal third quarter 2002, which ended December 1, 2001, a 124 percent increase compared with revenues of $26.8 million for the same period last year and an 8.7 percent increase compared with revenues of $55.3 million for the prior quarter.

Pro forma net income for the quarter was $3.6 million or $0.03 per share, compared with a pro forma net loss of $7.1 million or $0.08 per share for the third quarter of fiscal 2001, and a pro forma net income of $1.6 million or $0.01 per share for the prior quarter.

GAAP net income for the third quarter, which includes stock-based compensation and amortization of goodwill, was $2.2 million or $0.02 per share. This compares with a net loss of $34.9 million or $0.38 per share for the third quarter of fiscal 2001. GAAP net income for the prior quarter was $64,000, or breakeven on a per share basis.

"We are pleased to deliver another record quarter of increasing revenues, profit and market share," said Romulus Pereira, Riverstone president and chief executive officer. "Riverstone continues to set the standard for carrier products in the metro market. Our solutions enable our customers to create and deliver profitable services, lower costs, and maximize returns from their infrastructure."

42) These statements were false. The true facts which were known (or consciously disregarded) by each of the Defendants but concealed from the public were as follows:

   a) The Company's reported financial results were materially false and misleading as described below;

   b) The Company's purported ability to reach 1 million customers via its deal with Hutchison was a pipe dream, because Hutchison had less than 150,000 customers and its growth rate was less than 7% per month; and

   c) The Company's revenue recognition policy was regularly disregarded in favor of the Defendants' desire to ship products and report revenues even though the customer had little if any ability to pay.

43) On February 28, 2002, the Individual Defendants caused Riverstone to issue a press release entitled, "Riverstone Networks Announces Preliminary Fourth Quarter Results." The press release stated in part:

Riverstone Networks, Inc., a leader in metropolitan area networking, today announced that it expects revenues for the fourth quarter ending March 2, 2002, to be approximately $50 million to $54 million. Based on these revenues, the Company anticipates it will breakeven or have a slight loss on a pro forma basis. These pro forma results exclude fourth quarter charges, as well as amortization of goodwill and stock compensation expense.

The Company also announced that it would reduce its expenses, including workforce reductions, resulting in an approximately 10 percent reduction in the Company's overall cost structure in the first quarter of fiscal 2003, which ends June 1, 2002. The Company expects to take charges in the fourth quarter totaling approximately $26 million to $30 million, consisting of asset impairments, write downs in equity investments, charges related to discontinued products and costs associated with workforce reductions.

Riverstone's revised expectations are a result of deteriorating market conditions, primarily in the US and Europe, which  have caused service providers and carriers to delay infrastructure build outs.  Despite the macro economic climate, carriers continue to choose Riverstone for its industry leading metro-optimized products and solutions.

"We continue to focus on our financial metrics and remain committed to long-term profitability," said Romulus Pereira, President and CEO of Riverstone Networks.  'We also remain committed to our carrier customers and to providing them with network infrastructure that converts raw bandwidth into profitable services."

44)  On March 26, 2002, the Individual Defendants caused Riverstone to issue a press release entitled, "Riverstone Networks Reports Fourth Quarter and Fiscal Year End 2002 Results; Company Reports Fiscal 2002 Revenues of $210.8 million, a 114 Percent Increase Over Previous Year."  The press release stated in part:

Riverstone Networks, Inc., a pioneer in metropolitan area networking, today reported results for its fourth quarter and fiscal year ended March 2, 2002.

Revenues for the fourth quarter of fiscal 2002 were $51.3 million, compared with revenues of $35.1 million for the same period last year and $60.1 million for the third quarter of fiscal 2002.   Pro forma net loss for the quarter was $1.7 million or $0.1 per share, compared with pro forma net loss of $5.5 million or $0.06 per share for the fourth quarter of fiscal 2001, and pro forma net income of $3.6 million, or $0.03 per share for the third quarter of fiscal 2002.

GAAP net loss for the fourth quarter, which includes a charge of $1.1 million relating to stock-based compensation and goodwill associated with acquisitions, a restructuring charge of $3.3 million, and a non-cash charge of $22.1 million related to the impairment of investments in privately-held companies, was $28.2 million, or $0.23 per share.  This compares with a GAAP net loss of $6.6 million or $0.07 per share for the fourth quarter of fiscal 2001 and GAAP net income of $2.2 million or $0.02 per share for the third quarter of fiscal 2002.

Revenues for the year ended March 2, 2002 were $210.8 million, a 114 percent increase compared with revenues of $98.3 million for fiscal 2001.  Pro forma net loss for fiscal 2002 was $252,000, or breakeven on a per share basis, compared with pro forma net loss of $32.8 million or $0.35 per share for fiscal 2001.

GAAP net loss for the year, which includes a charge of $5.0 million relating to a stock-based compensation and goodwill associated with acquisitions, a restructuring charge of $3.3 million, and a noncash-charge of $22.1 million related to the impairment of investments in privately-held companies, was $30.7 million, or $0.27 per share.  This compares with a GAAP net loss of $65.8 million or $0.71 per share for fiscal 2001.

45)  On March 27, 2002, Defendant Pereira was interviewed by CNBC.  A published report of that interview follows:

> Riverstone Networks, Inc. Chief Executive Officer Romulus Pereira said on financial news network CNBC that the maker of gear to direct Internet traffic expects to break even or post a small profit in the current quarter.

> "We're fairly well diversified and we've got new market segments like Canada and Latin America starting to open up," Pereira said.  "There's plenty of mid-tier business as well as good tier-one business in Asia to keep the revenue moving until the U.S. markets come back in force."

> Pereira said the company has $450 million in cash on hand.

46)  The above statements were materially false and misleading because Pereira actually knew that:

> a)  the Company's Asian business had materially deteriorated and had become so dire that may of the Company's Asian clients could not even pay amounts owed to the Company;

> b)  the Company had only a fraction of the claimed "$450 million in cash;" and

> c)  the Company's financial results were materially false and misleading as described below.

47)  On June 5, 2002, the Individual Defendants caused Riverstone to issue a press release entitled, " Riverstone Networks Announces Preliminary First Quarter Results."  The press release stated in part:

> Riverstone Networks, Inc., a leader in metropolitan area networking, today announced estimated financial results for the first quarter of fiscal 2002, which ended June 1, 2002.

> Reflecting continued cautious spending on the part of telecommunications carriers, the Company expects revenue for the first quarter to be approximately $30 million to $31 million. Based on these revenues, the Company expects to report a pro forma net loss for the quarter of approximately $0.11 per share to $0.13 per share, excluding amortization of goodwill and stock compensation expense.

> "Despite capital spending remaining conservative, we continue to see strong initial deployments from carriers around the world, indicating that metro projects are a priority," said

Romulus Pereira, president and chief executive officer of Riverstone Networks. "Accordingly, our focus remains on delivering best-in-class products and solutions. With a strong cash balance, we are well positioned to meet the next-generation networking needs of carriers around the world."

48) On June 19, 2002, the Individual Defendants caused Riverstone to issue a press release entitled, "Riverstone Networks Reports First Quarter Fiscal 2003 Results; Results in Line with Previously Announced Expectations; Revenues of $30.1 Million and Pro Forma EPS of $(0.12)." The press release stated in part:

Metropolitan area networking pioneer Riverstone Networks, Inc. today reported first quarter results for the period ending June 1, 2002.

Revenues for the first quarter of fiscal 2003 were $30.1 million, compared with revenues of $44.2 million for the same period last year and $51.3 million for the fourth quarter of fiscal 2002. Pro forma net loss for the quarter was $15.3 million or $0.12 per share, compared with pro forma net loss of $3.6 million or $0.03 per share for the first quarter of fiscal 2002, and pro forma net loss of $1.7 million, or $0.01 per share for the fourth quarter of fiscal 2002.

GAAP net loss for the first quarter was $15.9 million, or $0.13 per share. This compares with a GAAP net loss of $4.7 million or $0.04 per share for the first quarter of fiscal 2002 and GAAP net loss of $28.2 million or $0.23 per share for the fourth quarter of fiscal 2002.

"While telecommunications carrier spending remains cautious, their priorities continue to reflect the shift from voice to data networks," said Romulus Pereira, president and chief executive officer of Riverstone Networks. "Riverstone's product portfolio and strong customer base position us well as carriers around the world prepare to build the next generation service network."

## RIVERSTONE'S FALSE FINANCIAL
## REPORTING DURING THE RELEVANT PERIOD

49) In order to falsely overstate Riverstone's revenues, earnings and assets during the Relevant Period, the Individual Defendants caused Riverstone to violate GAAP and SEC rules by failing to properly report the diminished value of certain of its investments in telecommunications related companies. The Individual Defendants and Riverstone now admit that the value of the investment is only a fraction of its carrying amount which they attributed to these items. The amount

of impairment, $22.1 million, was material and should have been recorded and disclosed in the Company's financial statements by at least September 2001.

50) These financial statements and the statements about them were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting for its investment in technology companies, in violation of GAAP and SEC rules.

51) GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. § 210.10-01(a).

52) GAAP, as set forth in Accounting Principles Board opinion ("APB") No. 18, requires that companies must recognize a decrease in value of an investment carried under the cost method of accounting by a charge against earnings when a decline in value of the investment is other than temporary.  A series of operating losses or other factors may indicate that a decrease in value of the investment has occurred which is other than temporary and should be recognized.

53) By the time it reported its financial results at the beginning of the Relevant Period, several of Riverstone's investments in telecommunications related companies had deteriorated dramatically as compared to their value.  Thus, the Defendants were increasingly aware that the impairment in value was not temporary.

54) Pursuant to GAAP, as set forth in APB No. 18 and SFAS No. 121, the Company was required to recognize a loss to reflect the non-temporary impairment.   Contrary to GAAP, the Individual Defendants caused Riverstone to not reflect such losses, as to do so would have so reduced the Company's earnings during the Relevant Period and would have been an admission that the Company's current business and future prospects were bleak, at best, and that the integration was a failure.

55) The Individual Defendants caused Riverstone to ultimately admit in its February 28, 2002 press release that:

> Riverstone Networks, Inc., a leader in metropolitan area networking, today announced that it expects revenues for the fourth quarter ending March 2, 2002, to be approximately $50 million to $54 million.  Based on  these revenues, the Company anticipates it will breakeven or have a slight loss on a pro forma basis.  These pro forma results exclude fourth quarter charges, as well as amortization of goodwill and stock compensation expense.
>
> The Company also announced that it would reduce its expenses, including workforce reductions, resulting in an approximately 10 percent reduction in the Company's overall cost structure in the first quarter of fiscal 2003, which ends June 1, 2002.  The Company expects to take charges in the fourth quarter totaling approximately $26 million to $30 million, consisting of asset impairments, write downs in equity investments, charges related to discontinued products and costs associated with workforce reductions.
>
> Riverstone's revised expectations are a result of deteriorating market conditions, primarily in the US and Europe, which  have caused service providers and carriers to delay infrastructure build outs.  Despite the macro economic climate, carriers continue to choose Riverstone for its industry leading metro-optimized products and solutions.
>
> "We continue to focus on our financial metrics and remain committed to long-term profitability," said Romulus Pereira, President and CEO of Riverstone Networks.  'We also remain committed to our carrier customers and to providing them with network infrastructure that converts raw bandwidth into profitable services."

56) Moreover, in order to inflate the price of Riverstone stock, Defendants caused the Company to falsely report its results through improper revenue recognition.

57) The results issued during the Relevant Period were included in Form 10-Qs filed with the SEC.  The results were also included in press releases disseminated to the public.  These prior

financial statements were not a fair presentation of Riverstone's results and were presented in violation of GAAP and SEC rules.

58) In Riverstone's 2001 Form 10-K, the Individual Defendants caused Riverstone to represent that it recognized revenue in accordance with GAAP.

59) Pursuant to GAAP, revenue should not be recognized unless there is persuasive evidence of an agreement, ***collection is probable*** and delivery has occurred.

60) During the Relevant Period, the Individual Defendants caused Riverstone to improperly recognize revenue even though these conditions did not exist.

61) Ultimately, on June 20, 2002, the Individual Defendants caused Riverstone to reveal that the Company's receivables had deteriorated.  In fact, the Individual Defendants caused the Company to reveal that its DSO's had jumped from 77 days to 151 days.  Thus, the Company's clients were taking nearly half a year to pay but the Company was immediately recognizing revenue upon shipment.  The Company's recognition of revenue was premature.

62) Due to these accounting improprieties, the Individual Defendants caused the Company to present its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

a)  The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶ 10);

b)  The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶ 34);

c)  The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and

circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶ 40);

d) The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶ 50);

e) The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶ 42);

f) The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶ 58-59);

g) The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶ 79); and

h) The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶ 95, 97).

63) Further, the undisclosed adverse information concealed by Defendants during the Relevant Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

64) Plaintiff brings this action derivatively in the right and for the benefit of Riverstone to redress injuries suffered, and to be suffered, by Riverstone as a direct result of the breaches of fiduciary duty, abuse of control, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Riverstone is named as a nominal Defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

65) Plaintiff will adequately and fairly represent the interests of Riverstone in enforcing and prosecuting its rights.

66) Plaintiff is and was an owner of the stock of Riverstone during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

67) The current Board of Directors of Riverstone consists of the following individuals: Defendants Periera, Patel, Paisley and Calvo.  Plaintiff  has not made any demand on the present Board of Directors of Riverstone to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

a) As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees, and directors; and attendance at Board meetings, each of the Defendants knew the adverse non-public information regarding the improper

accounting.   While in possession of this material adverse non-public information regarding the Company, the following two current members of the Riverstone' Board participated in the illegal insider selling:

> i) During the Relevant Period, Periera sold 105,769 shares of Riverstone stock for proceeds of over $1.8 million.

> ii) During the Relevant Period, Patel sold 251,040 shares of Riverstone stock for proceeds of over $3 million.  Because these Defendants personally benefitted from their wrongdoing, and there is a substantial likelihood of liability due to the improper insider selling, any demand upon them is futile;

b) Defendant Periera, as CEO, is an inside director of Riverstone, and his principal professional occupation is his employment with Riverstone, pursuant to which he received and continues to receive substantial monetary compensation and other benefits.  Accordingly, Defendant Periera is beholden to the other members of the Board to maintain his employment with Riverstone, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action;

c) According to Riverstone's Proxy Statement filed with the SEC on or aboutJune 25, 2001, Defendants Calvo and Paisley were, during the Relevant Period, members of the Audit Committee. The Audit Committee is responsible for reviewing the Company's system of internal control and its financial and accounting practices and reviewing the Company's systems relating to compliance with laws, rules, regulations and Company policies.  Nonetheless, the Audit Committee recommended to the Board of Directors that the Company's audited consolidated financial statements be included in our Annual Report on Form 10-K for the fiscal year ended March 3, 2001, and be filed with the SEC. By such actions, Defendants Calvo and Paisley breached their duties by causing or allowing the

improper financials described above.  As a result of the Defendants' breach of these duties, in taking the action requested by Plaintiff herein, there is a substantial likelihood of liability as to Defendants Calvo and Paisley, making any demand upon them futile;

d) The entire Riverstone Board of Directors and senior management participated in the wrongs complained of herein.  Riverstone' directors and senior management are not disinterested or independent due to the following: Defendants Periera, Patel, Paisley and Calvo served on the Riverstone Board during the Relevant Period.  Pursuant to their specific duties as board members, each was charged with the management of the Company and to conduct its business affairs.  Each of the above-referenced Defendants breached the fiduciary duties that they owed to Riverstone and its shareholders in that they failed to prevent and correct the improper financials;

e) Thus, the Riverstone Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions which have subjected Riverstone to millions of dollars in liability for possible violations of applicable securities laws;

f) The Individual Defendants, because of their inter-related business and professional relationships, have developed debilitating conflicts of interest which prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein.  In addition to the conflicts that exist as a result of their participation in the improper insider selling, as detailed herein *supra*, the majority of the Board, including the Defendants listed below, are subject to the following prejudicial entanglements:

i) Director Defendant Patel served as the Chairman, President and CEO of Cabletron and thus developed entangling business and professional relationships with Periera.  Moreover, by virtue of his knowledge, and business dealings in the merger of Cabletron and

the Company, he is not independent and could not adequately consider a shareholder demand; and

      ii)  Director Defendant Calvo is a partner in the law firm used by the Company as its outside counsel.  As such, he and his law firm have developed business relationships with Periera and the Company and have receive substantial consideration from the Company which destroy Calvo's independence;

g) The Director Defendants of Riverstone, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Riverstone's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

h) In order to bring this suit, all of the directors of Riverstone would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

i)  The acts complained of constitute violations of the fiduciary duties owed by Riverstone's officers and directors and these acts are incapable of ratification;

j) Each of the Director Defendants of Riverstone authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

k) Any suit by the current directors of Riverstone to remedy these wrongs would likely expose the Individual Defendants and Riverstone to further violations of the securities laws which would result in civil actions being filed against one or more of the Individual Defendants, thus, they

are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

l)  Riverstone has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Riverstone any part of the damages Riverstone suffered and will suffer thereby;

m)  If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants.  In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions.  This they will not do.  Thus, demand is futile; and

n) If Riverstone's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Riverstone.  However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the Defendants in this case contain provisions which eliminate coverage for any action brought directly by Riverstone against these Defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a result, if these directors were to sue themselves or certain of the officers of Riverstone, there would be no directors' and officers' insurance protection and thus, this is a further

reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate  recovery.  If there is no directors' and officers' liability insurance at all then the current directors will not cause Riverstone to sue them, since they will face a large uninsured liability.

68)  Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by Plaintiff, the current Board of Directors has failed and refused to seek to recover for Riverstone for any of the wrongdoing alleged by Plaintiff herein.

### FIRST CAUSE OF ACTION

### Against All Defendants for Breach of Fiduciary Duty

69)  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

70)  The Individual Defendants owed and owe Riverstone fiduciary obligations.  By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe Riverstone the highest obligation of good faith, fair dealing, loyalty, and due care.

71)  The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision.

72)  Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

///

///

73)  As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Riverstone has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

74)  Plaintiff on behalf of Riverstone has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Against All Defendants for Abuse of Control

75)  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

76)  The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Riverstone, for which they are legally responsible.

77)  As a direct and proximate result of the Individual Defendants' abuse of control, Riverstone has sustained significant damages.

78)  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

79)  Plaintiff on behalf of Riverstone has no adequate remedy at law.

## THIRD CAUSE OF ACTION

### Against All Defendants for Gross Mismanagement

80)  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

81)  By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Riverstone in a manner consistent with the operations of a publicly held corporation.

82)  As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Riverstone has sustained significant damages in excess of hundreds of millions of dollars.

83)  As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

84)  Plaintiff on behalf of Riverstone has no adequate remedy at law.

## FOURTH CAUSE OF ACTION

### Against All Defendants for Unjust Enrichment

85)  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

86)  By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Riverstone.

87)  Plaintiff seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

88)  Plaintiff, as a shareholder and representative of Riverstone, seeks restitution and disgorgement of profits for the Company as hereinafter set forth.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

(A)     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, and unjust enrichment;

(B)     Extraordinary equitable and/or injunctive relief as permitted by law and equity sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting

the proceeds of Defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of Riverstone has an effective remedy;

(C)     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

(D)     Granting such other and further relief as the Court deems just and proper.

DATED: February 10, 2003                **DREHER LAW FIRM**

                                        _____/s/_____
                                        Robert Scott Dreher
                                        Attorneys for Plaintiff

                                        **JURY DEMAND**

    Plaintiff respectfully demands a jury trial on all issues so triable..

DATED: February  10, 2003               **DREHER LAW FIRM**

                                        _____/s/_____
                                        Robert Scott Dreher
                                        835 Fifth Avenue, Suite 202
                                        San Diego, CA 92101
                                        Telephone: (619) 230-8828
                                        Facsimile:  (619) 687-0136

                                        **RABIN, MURRAY & FRANK, LLP**
                                        Eric J. Belfi
                                        275 Madison Avenue, 34th Floor
                                        New York, NY 10016
                                        Telephone:  (212) 682-1818
                                        Facsimile: (212) 682-1892

                                        **EMERSON POYNTER LLP**
                                        John G. Emerson, Jr.
                                        Scott E. Poynter
                                        P.O. Box 164810
                                        Little Rock, AR 72216-4810
                                        Telephone:  (501) 907-2555
                                        Facsimile: (501) 907-2556

                                        Attorneys for Plaintiff

M:\JD\CASES\171\pleadings\complaint.doc