1  Eric J. Belfi
   **RABIN, MURRAY & FRANK LLP**
2  275 Madison Avenue
   New York, NY 10016
3  Telephone: (212) 682-1818
   Facsimile: (212) 682-1892
4
   John G. Emerson
5  Scott E. Poynter
   **EMERSON POYNTER LLP**
6  P.O. Box 164810
   Little Rock, AR 72216-4810
7  Telephone: (501) 907-2555
   Facsimile: (501) 907-2556
8
   Robert Scott Dreher, SBN 120527
9  **DREHER LAW FIRM**
   835 Fifth Avenue, Suite 202
10 San Diego, CA 92101
   Telephone: (619) 230-8828
11 Facsimile: (619) 687-0136

12 Attorneys for Plaintiff

13                 **UNITED STATES DISTRICT COURT**

14               **NORTHERN DISTRICT OF CALIFORNIA**

15                  **SAN FRANCISCO DIVISION**

16 GREGORY WATTERSON, Derivatively On   ) Case No. C 03-0637 SBA
   Behalf of RIVERSTONE NETWORKS, INC., )
17                                       )   **VERIFIED FIRST AMENDED**
18           Plaintiff,                  )   **SHAREHOLDER DERIVATIVE**
                                         )       **COMPLAINT**
19      vs.                              )
                                         )
20 ROMULUS PEREIRA, PIYUSH PATEL,       )
   CHRISTOPHER PAISLEY, ERIC JAEGER,    )
21 JORGE A. DEL CALVO, ROBERT           )
   STANTON, SURESH GOPALAKRISHNAN,      )
22 and JOHN KERN,                       )
                                         ) Date Action Filed: February 14, 2003
23           Defendants,                 )
                                         )
24      - and -                          )
                                         )    DEMAND FOR JURY TRIAL
25 RIVERSTONE NETWORKS, INC., a Delaware )
   corporation,                          )
26                                       )
             Nominal Defendant.          )
27 _____)

28

                            - 1 -

Plaintiff, by his attorneys, submits this Verified First Amended Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of Riverstone Networks, Inc. ("Riverstone" or the "Company"), on behalf of the Company, against certain of its officers and directors seeking to remedy defendants' violations of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), and California and Delaware common and statutory law, including breaches of fiduciary duty, that occurred from August 2001 to the present (the "Relevant Period") and that have caused substantial damages to Riverstone.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over all causes of action asserted herein based upon 15 U.S.C. § 1331, in that a federal question exits, and Rule 23.1 of the Federal Rules of Civil Procedure.

3.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts in California and in this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

4.      Venue is proper in this Court because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities which had an effect in this District.

## SUMMARY OF THE ACTION

5.      During the Relevant Period, defendants caused the Company to violate Generally Accepted Accounting Principles ("GAAP") and Securities and Exchange Commission ("SEC") rules by wrongfully recognizing revenue that had not been earned and by failing to report the diminished value of certain investments.

6.     Beginning in March 2002, the Company was forced to admit the value of its investments were much lower than previously reported.  Because of the defendants' GAAP violations, the Company was originally forced to write-down $22.1 million in certain investments and record a $1.7 million provision for bad debt on March 2, 2002.  Eventually, however, the Company was forced to reveal by December 2002 a total impairment of $57.1 million of its assets.  This impairment was clearly material and should have been recorded and disclosed in the Company's financials by at least September 2001.

7.     The defendants also forced the Company to wrongfully recognize revenue.  In order to meet the Company's financial expectations that the defendants provided to analysts, the defendants manipulated the Company's revenues at the end of fiscal quarters with "sales" which were a complete sham.  In fact, a large percentage of Riverstone's quarterly revenue was directly manipulated by the Chief Executive Officer and Chief Financial Officer by shipping product to certain customers and recognizing the revenue from those shipments, but then allowing the customer to return the product the next quarter.

8.     This clear violation of GAAP has resulted in a recent financial restatement, which reversed net revenue by as much as $98.8 million for Riverstone's 2002 and 2003 fiscal years.  This restatement of net revenue amounted to an incredible 46% of the corrected net revenue for those two years.  Unfortunately for Riverstone and its shareholders, the restatement may eventually be even larger as an internal and SEC investigation continues into these revenue recognition violations.

## THE PARTIES

9.     Plaintiff Gregory Watterson is, and was at times relevant hereto, an owner and holder of Riverstone common stock.

10.    Nominal defendant Riverstone is a corporation organized and existing under the laws of the State of Delaware with its headquarters located at 5200 Great America Parkway, Santa Clara, California.  Riverstone is a provider of metropolitan area networking solutions that enable service providers to convert raw bandwidth into profitable services over legacy and next-generation infrastructures.

11.    Defendant Romulus Pereira was, at times relevant hereto, President, Chief Executive Officer ("CEO") and a director of Riverstone.  On April 21, 2003, Pereira became Riverstone's

Chairman of the Board of Directors, replacing Piyush Patel.  On that same date, Riverstone announced that the Company had launched a search for a new CEO and made Pereira the acting CEO. Pereira directly participated in the wrongdoing alleged in this Complaint and personally benefited from his misconduct.  For the year ended March 2, 2002, Riverstone paid Pereira $229,327 in salary and granted him 13,468 options to purchase Riverstone stock.  For the year ended March 2, 2002, Pereira also acquired 103,868 Riverstone shares on option exercises, immediately realizing $1,420,395.[1] Additionally, during the Relevant Period, Pereira sold 103,868 shares of Riverstone stock for proceeds of $1,804,497.  On August 20, 2003, Oscar Rodriguez succeeded Pereira as CEO and President, but Pereira remains as the Chairman of the Board.

12.     Defendant Piyush Patel is, and at all times relevant hereto was, a director of Riverstone and a member of its Audit Committee.  Patel was Chairman of the Board of Directors until April 21, 2003, when Pereira replaced him. Patel participated in the wrongdoing alleged in this Complaint, and personally benefited from his misconduct by selling 253,633 shares of Riverstone stock for proceeds of $3,397,309.

13.     Defendant Eric Jaeger was a director of Riverstone at all times relevant hereto, until July 2002.  During the Relevant Period, Jaeger participated in the wrongdoing alleged in this Complaint, and personally benefited from his misconduct by selling 161,615 shares of Riverstone stock for proceeds of $1,570,851.

14.     Defendant Christopher Paisley is, and at all times relevant hereto was, a director of Riverstone and a member of its Audit Committee.

15.     Defendant Jorge A. del Calvo is, and at all times relevant hereto was, a director of Riverstone.  Del Calvo is also a partner at the law firm of Pillsbury Winthrop LLP ("Pillsbury"), Riverstone's primary outside corporate and securities counsel.

16.     Defendant Robert Stanton is, and at all times relevant hereto was, Chief Financial Officer ("CFO") of Riverstone.  Stanton directly participated in the wrongdoing alleged in this

---

[1] Pereira's FY2003 compensation is unavailable because Riverstone has not filed a Schedule 14A for fiscal 2003.

1   Complaint and personally benefited from his misconduct.  For the year ended March 2, 2002,

2   Riverstone paid Stanton $225,208 in salary and granted him 150,000 options to purchase Riverstone

3   stock.  For the year ended March 2, 2002, Stanton acquired 36,000 Riverstone shares on option

4   exercises, immediately realizing $533,273.[2]  Additionally, during the Relevant Period, Stanton also sold

5   36,000 shares of Riverstone stock for proceeds of $659,340.  On October 21, 2003, Roger A. Barnes

6   replaced Stanton as CFO.

7           17.     Defendant Suresh Gopalakrishnan is, and at all times relevant hereto was, Executive

8   Vice President of Engineering of Riverstone.  During the Relevant Period, Gopalakrishnan participated

9   in the issuance of false and/or misleading financial statements, including the preparation of false and/or

10  misleading press releases and SEC filings, and personally benefited from his misconduct.  For the year

11  ended March 2, 2002, Riverstone paid Gopalakrishnan $180,000 in salary and granted him 6,413

12  options to purchase Riverstone stock.   For the year ended March 2, 2002, Gopalakrishnan acquired

13  36,413 Riverstone shares on option exercises, immediately realizing $461,721.  During the Relevant

14  Period, Gopalakrishnan sold 36,413 shares of Riverstone stock for proceeds of $623,199.  Praveen K.

15  Mandal has replaced Gopalakrishnan as Executive Vice President of Engineering.

16          18.     Defendant John Kern is, and at all times relevant hereto was, Executive Vice President of

17  Worldwide Sales and Service of Riverstone.  During the Relevant Period, Kern participated in the

18  issuance of false and/or misleading financial statements, including the preparation of false and/or

19  misleading press releases and SEC filings, and personally benefited from his misconduct.  For the year

20  ended March 2, 2002, Riverstone paid Kern $338,123 in salary and other compensation and granted him

21  130,000 options to purchase Riverstone stock.  For the year ended March 2, 2002, Kern acquired 45,800

22  Riverstone shares on option exercises, immediately realizing $514,733.  During the Relevant Period,

23  Kern sold 25,800 shares of Riverstone stock for proceeds of $472,527.  On March 19,2003, Peter

24  McGann replaced Kern as Executive Vice President of Worldwide Sales and Service.

25

26  _____

27  [2] Stanton's FY2003 compensation is unavailable because Riverstone has not filed a Schedule 14A for
    fiscal 2003.

28

19.     Collectively, the defendants identified in paragraphs 11 through 18 are referred to herein as the "Individual Defendants."

### DUTIES OF THE INDIVIDUAL DEFENDANTS

### AND DAMGES RESULTING FROM THEIR BREACHES OF DUTIES

20.     By reason of their positions as officers, directors, and/or fiduciaries of Riverstone and because of their ability to control the business and corporate affairs of Riverstone, the Individual Defendants owed Riverstone and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Riverstone in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Riverstone and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

21.     Each director and officer of the Company owes to Riverstone and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

22.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Riverstone, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial, and directorial positions with Riverstone, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and improper representations of Riverstone.

23.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Riverstone and was at all times acting within the course and scope of such agency.

VERIFIED FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

24.    To discharge their duties, the officers and directors of Riverstone were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Riverstone were required to, among other things:

(a)    refrain from acting upon material inside corporate information to benefit themselves;

(b)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)    remain informed as to how Riverstone conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

25.    Each Individual Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants

1  complained of herein involves a knowing and culpable violation of their obligations as directors and

2  officers of Riverstone, the absence of good faith on their part, and a reckless disregard for their duties to

3  the Company and its shareholders that the Individual Defendants were aware or should have been aware

4  posed a risk of serious injury to the Company.

5        26.    The Individual Defendants breached their duties of loyalty and good faith by allowing

6  defendants to cause or by themselves causing the Company to misrepresent its financial results and

7  prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such

8  illegal actions.  In addition, as a result of defendants' illegal actions and course of conduct during the

9  Relevant Period, the Company is now the subject of a class action lawsuit that alleges violations of

10  federal securities laws.  As a result, Riverstone has expended and will continue to expend significant

11  sums of money.  Such expenditures include, but are not limited to:

12        (a)    Costs incurred to carry out internal investigations, including legal fees paid to

13      outside counsel; and

14        (b)    Costs incurred in investigating and defending Riverstone and certain officers in

15      the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse

16      judgment.

17        27.    The Individual Defendants' actions have irreparably damaged Riverstone.  As a direct

18  and proximate result of the actions detailed in this Complaint, Riverstone has suffered and continues to

19  suffer damages.  Riverstone has been forced to pay, *via* the Individual Defendants' misconduct,

20  increased salaries, bonuses, and other compensation for which it is entitled to restitution.  Additionally,

21  many of the Individual Defendants millions of dollars in personal holdings of Riverstone stock of which

22  the Company is entitled to the proceeds thereof pursuant to Delaware and California common and

23  statutory law and Sarbanes-Oxley.  Also, Riverstone has been damaged and continues to suffer damages

24  because the Individual Defendants' violations of GAAP and issuance of false and/or misleading

25  financial information has resulted in the filing of a securities fraud class action and an investigation by

26  the SEC.  The class action and the SEC investigation has damaged the Company through the payment

27  of costs as a result thereof, and will continue to damage the Company via costs associated with the

28  further litigation of the class action case and the SEC investigation.  Additionally, the class action and

- 8 -

1  the SEC investigation will cost the Company millions of dollars more to satisfy.    Moreover,

2  Riverstone's corporate image and goodwill has been damaged.  For at least the foreseeable future,

3  Riverstone will suffer from what is known as the "liar's discount," a term applied to the stocks of

4  companies who have been implicated in illegal behavior and have misled the investing public, such that

5  Riverstone's ability to raise equity capital or debt on favorable terms in the future is now impaired.

6                                   **BACKGROUND**

7        28.    In September 1996, defendants Pereira and Patel were two of the three founders of Yago

8  Systems, Inc. ("Yago").  From its inception until March 1998, defendant Pereira served as Yago's Chief

9  Technology Officer ("CTO") and Vice President of Engineering and defendant Patel served as Yago's

10 CEO.  In March 1998, Yago was acquired by Cabletron Systems, Inc. ("Cabletron", later renamed

11 Entaerasys) and became a wholly owned subsidiary of Cabletron.

12       29.    On February 10, 2000, Cabletron announced its plan to create an independent publicly

13 traded company, Riverstone Networks, Inc., comprised of Cabletron's Internet infrastructure solutions

14 business for Internet service providers and other service providers.   After the completion of

15 Riverstone's initial public offering on February 22, 2001, Cabletron owned 92,088,235 shares of

16 Riverstone common stock, representing approximately 86% of Riverstone's outstanding common stock.

17       30.    On June 3, 2000, Cabletron, Riverstone, and certain related parties entered into a

18 Transformation Agreement, and Cabletron and Riverstone entered into a Contribution Agreement.  In

19 accordance with the Transformation Agreement, Cabletron transferred to Riverstone the Cabletron-

20 owned assets and liabilities which related to the Riverstone business on August 28, 2000 (the

21 "Contribution Date").  Zeitnet, Inc. was also contributed to and then merged into Riverstone.

22       31.    On July 24, 2001, Riverstone issued 7,117,757 shares of common stock to Cabletron in

23 exchange for approximately $122 million in cash and certain strategic investments, with an historic cost

24 of approximately $13 million.  Many of Cabletron's top officers and directors became Riverstone's top

25 executives.

26       32.    The Company's stated revenue recognition policy is as follows: the Company generally

27 recognizes revenue upon shipment of products provided there are no uncertainties regarding customer

28 acceptance, persuasive evidence of an arrangement exists, the sales price is fixed and determinable, and

1  collectibility is deemed probable.  If uncertainties exist, revenue is recognized when such uncertainties

2  are resolved.  Revenues from service and maintenance contracts are deferred and recognized ratably

3  over the period the services are performed, typically twelve months or less.  When the Company

4  provides a combination of products and services to a customer, revenue is allocated based on the fair

5  values.  Estimated costs to repair or replace products that may be returned under warranty are accrued at

6  the time of shipment.  The Company's warranty period typically extends twelve months from the date

7  of shipment.  Sales to customers in which the Company receives an equity instrument as consideration

8  are recorded at the estimated fair value of the instrument received as determined by an independent

9  appraisal or a recent cash equity transaction received by the customer from an unrelated third party.

10  Deferred revenue is recognized into income when the above criteria have been met.

## THE INDIVIDUAL
## DEFENDANTS' VIOLATIONS OF GAAP

13  33.   In order to overstate its revenues and assets during the Relevant Period, the Individual

14  Defendants caused Riverstone to violate GAAP and SEC rules by wrongfully recognizing revenue and

15  failing to properly report the diminished value of certain of its investments.

16  **IMPROPER REVENUE RECOGNITION**

17  34.   In order to meet the earnings estimates the Individual Defendants provided to analysts

18  and to personally profit from their sales of Company stock, the Individual Defendants inflated the price

19  of Riverstone stock by causing the Company to falsely report its results through improper revenue

20  recognition.

21  35.   Defendants caused the Company to report improper and inflated revenues during the

22  Relevant Period in its financial statements filed in SEC Forms 10-Q for quarter periods in 2002 and

23  2003 and SEC Form 10-K for the fiscal year ended March 2, 2002, and its announced revenues for the

24  fiscal year ended March 1, 2003, including press releases as detailed herein.  A substantial percentage

25  of Riverstone's quarterly revenue was based on purchase orders received (usually by fax) and recorded

26  as revenue on the last day of each quarter.  In addition, these sales did not represent deals made by the

27  sales department or account managers but were instead originated by defendants Stanton and Pereira.

28  Many of these "end-of-the-quarter" deals would be returned during the following quarter.  Customers

1   claimed on the Return Material Authorization ("RMA") form that the products were defective.  The

2   amount of returned product was so voluminous that Riverstone ran out of storage space and employees

3   had to store returned product in their cubicles and work areas.  For example, one of the Company's key

4   customers was Qwest in Denver, Colorado.  During the Relevant Period, sales representatives would

5   often call end-users (customers of Qwest) inquiring about the reasons for returns and typically the end-

6   user did not have any record or knowledge of having ordered or receiving Riverstone's product.

7        36.    In another example, Riverstone recorded approximately $9 million in revenue from Cox

8   Communications in early 2002.  In May 2002, at least $3 million was returned to Riverstone.  Despite

9   the fact that defendants knew that product would be returned the following quarter, the entire $9 million

10  was booked in the previous quarter.

11       37.    During the Relevant Period the rate of returns experienced by Riverstone was excessive.

12  The volume of returned products was so large that Riverstone had to rent offsite storage units to house

13  returned product.  The company also had to push-out walls while reconfiguring Riverstone's office

14  space so returned equipment could be stored in the office area.  Riverstone would also put returned

15  products in cubicles belonging to employees that didn't come to the office on a regular basis.  When an

16  order was returned, a credit document was issued and a copy was sent (via the Oracle database) to

17  defendant Kern's sales department.

18       38.    Before sending products back, customers had to call Riverstone's customer support

19  department to receive a RMA number.  Then, when Riverstone received the returned products, an entry

20  would be made in the Oracle database by the receiving department.  Once Riverstone got the products,

21  employees would verify whether or not they were still functional.  The customers who returned the

22  products had not even opened most of the boxes before retuning them.  Where inventory had never been

23  opened, Riverstone would re-stock and re-sell it.  If the tape on the returned box was cut or damaged,

24  Riverstone would have the equipment tested and sent to the refurbishing department if needed.  In many

25  instances no explanations for the product returns were provided.

26       39.    Riverstone monitored inventory through count reports using the Oracle system.

27  Inventory on this report was categorized by location headings such as "refurbished warehouse,"

28

VERIFIED FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1   "returned unopened warehouse," etc.  Inventory counts were monitored by performing physical counts,

2   and by running inventory checks on the Oracle database.

3   40.   Daily meetings were held to discuss what to do with all of Riverstone's returned

4   products.  Riverstone's quality manager ran these meetings, which were attended by field engineers and

5   managers.  During these meetings, the group discussed what products were being returned, and what, if

6   any, technical issues were the results of the returns.  A technical support department was created and

7   headed up by Kern.  Minutes were kept which detailed these meetings.

8   41.   Many of Riverstone's last minute shipments were to larger customers, such as Cox

9   Communications, Qwest, Global Crossing, and Verizon.  Often during this period Riverstone would

10  ship product based upon the pretext that a customer was having a system failure of some sort.

11  Customers usually received the new systems in a 24-hour time frame.  It was not uncommon for

12  Riverstone to replace the same shipment on two or more consecutive days, regardless of whether or not

13  the customer had time to install it.  The types of systems shipped to these larger customers, such as Cox

14  Communications, were extremely expensive.  This duplicate shipping practice also happened with

15  Riverstone's Asia-based customers.  Riverstone shipped large quantities of equipment to Asia, and was

16  often shipped back.  In some cases, the equipment was never returned.

17  42.   Pereira was well aware of the repeated shipments of duplicate systems to Riverstone's

18  customers.   These shipments were discussed with Pereira during monthly meetings where the

19  department managers also presented their reports to him.  The reports presented to Pereira included the

20  sales reports, RMA reports, and quality reports (RMA and quality reports are described below).  Pereira

21  was especially concerned about the major accounts, and often asked for reports specifically related to

22  one customer, such as Cox Communications.

23  43.   Riverstone was improperly recognizing these repeated shipments as revenue, in violation

24  of GAAP.  When a duplicate system was shipped to Cox Communications, the price of the equipment

25  was recorded (on the Remedy database) against the Cox Communications' account.   Cox

26  Communications wouldn't actually know it had this fee charged to it account, and there was never a

27  purchase order issued for these shipments.  These shipments were recorded as revenue and included in

28  the weekly and monthly sales reports on the Remedy database, and on an Excel spreadsheet.  Numbers

1   were divided into two columns: sales orders for the month and sales orders for the week.  The duplicate

2   shipments were recorded in these sales reports.  This sales report was distributed to the "front line"

3   managers, including defendant Stanton.  Defendant Stanton discussed the reports at weekly meetings

4   with department managers, during April through July 2002.

5          44.    Riverstone's RMAs were much higher in volume than their competitors.  RMAs were

6   discussed often and were a big concern to Pereira.  Pereira spearheaded meetings on a weekly basis to

7   specifically discuss RMAs.  Managers would often discuss what to do about the frequent returns, and

8   where to store the returned equipment.  Defendant Gopalakrishnan assisted Pereira, and he also attended

9   these RMA meetings with Pereira.  Kern was usually in attendance as well.

10         45.    Pereira was very concerned about the public and Riverstone's customers finding out

11  about their high return rate.  During the RMA meetings, he would stress that the information discussed

12  needed to stay within the confines of the room.

13         46.    Another report that was generated from the RMA department's Oracle database

14  contained information about what equipment was shipped out and returned, which products had been

15  tested and classified as "failures," and which products had been tested and classified as "non-failures."

16  This report contained information about what equipment had been returned and tested.  According to

17  the RMA reports, there was almost never anything wrong with the equipment that had been returned

18  and tested.  In other words, most of the returns were classified as "non-failures."  Once a piece of

19  equipment was tested and classified as a non-failure, the Company would re-stock and then re-ship it to

20  the next customer.  If merchandise came back three times, then Pereira would order that it be dumped.

21  Generally returned goods were not due to failures.

22         47.    All of the reports (RMA, sales, and quality) discussed above were distributed to

23  management and the executive staff.  The reports were also posted on Riverstone's internal website,

24  which gave anybody working at Riverstone the opportunity to access the reports.

25         48.    Riverstone had to lease a warehouse facility at Flextronics to store returned equipment.

26  Riverstone bought equipment which was manufactured by Flextronics.  Riverstone would then build out

27  systems using Flextronic's equipment, and ship it to their end customers.  When the systems were

28  returned to Riverstone, it would often be tested and then shipped back to their storage facility at

- 13 -

Flextronics.   Pereira wanted Riverstone's returns managed by a third party (Flextronics), so the Company had many of its returns shipped offsite.

49.   Remedy and Oracle databases were updated into one Oracle database between approximately April and July 2002.  During this process accounting irregularities were brought up in meetings with Stanton.  Financial department employees would question Stanton about accounting variances that showed up on a monthly basis.  Stanton's sales figures were always higher than the sales reports the financial department received.  The financial department would ask him where his numbers came from, and he would attribute the difference to the system integration process.  Stanton's typical excuse was to blame it on the computer systems, and according to him, the sales figures he had were the correct numbers.  These numbers were always higher than the numbers the financial staff had on their sales reports.  Numbers also tended to disappear or fall-off reports.  Sales reports, RMA reports, and quality reports were affected by this conduct.

50.   Riverstone violated GAAP, SEC rules, and their own stated revenue recognition policy by recording bogus revenue.  The SEC's Staff Accounting Bulletin No. 101 "Revenue Recognition in Financial Statements" requires that:

(a)   persuasive evidence of an arrangement exists;

(b)   delivery has occurred;

(c)   the seller's price to the buyer is fixed or determinable; and

(d)   collectibility is reasonably assured.

51.   Here, there was no persuasive evidence that an arrangement existed and collectibility was not reasonably assured because defendants knew that the customers would be returning substantial amounts of the product in the next quarter.

52.   Financial Accounting Standards Board ("FASB") Statement of Concepts ("FASCON") No. 5 states: "If collectibility of assets received for product ... is doubtful, revenues and gains may be recognized on the basis of cash received."  FASCON 5, ¶ 84.g.  Riverstone also stated in its publicly filed financial statements that revenues were recorded in accordance with GAAP.

53.   To the extent that any of these "end-of-the-quarter" deals were legitimate, GAAP requires that the Company deduct from revenue all expected returns: "any costs or losses that may be

1   expected in connection with any returns shall be accrued . . . . and sales revenue and cost of sales

2   reported in the income statement shall be reduced to reflect estimates returns." Financial Accounting

3   Standards ("FAS") No. 48, ¶ 7.  Instead of reducing sales by these known returns, Riverstone recorded

4   the full sales amount in violation of FAS No. 48.

5        54.   Instead of deferring revenue on deals that would never be paid, defendants caused the

6   Company to record the entire sale and account receivable on its books.  As a result of recording bogus,

7   uncollectible revenue, the Individual Defendants caused Riverstone to reveal on June 20, 2002 that the

8   Company's receivables had deteriorated.  In fact, the Individual Defendants caused the Company's days

9   sales outstanding to almost double from 77 days to 151 days.  Thus, on average, customers were taking

10  nearly half a year to pay – if at all.

11  **FAILURE TO WRITE DOWN INVESTMENTS**

12       55.   As of March 2, 2002, Riverstone had recorded impairment write-downs of these

13  investments totaling $22.1 million and recorded a provision for bad debt of $1.7 million.  At that time,

14  Riverstone also included $25.2 million of these investments in long-term investments and $14.9 million

15  in other long-term assets.  Eventually, Riverstone recorded a non-cash charge on September 18, 2002 of

16  $10.7 million and an impairment charge on December 18, 2002 of $24.3 million related to investments

17  in privately-held companies.  Thus, the Individual Defendants have caused Riverstone to now admit that

18  the value of its investments is only a fraction of its carrying amount.  The amount of impairment of

19  $57.1 million was material and should have been recorded and disclosed in the Company's financial

20  statements by at least September 2001.

21       56.   These financial statements and the statements about them were false and misleading, as

22  such financial information was not prepared in conformity with GAAP, nor was the financial

23  information a fair presentation of the Company's operations due to the Company's improper accounting

24  for its investment in technology companies, in violation of GAAP and SEC rules.

25       57.   GAAP are those principles recognized by the accounting profession as the conventions,

26  rules, and procedures necessary to define accepted accounting practice at a particular time.  SEC

27  Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which

28  are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite

footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. § 210.10-01(a).

58.     GAAP, as set forth in Accounting Principles Board ("APB") Opinion No. 18, requires that companies must recognize a decrease in value of an investment carried under the cost method of accounting by a charge against earnings when a decline in value of the investment is other than temporary.  A series of operating losses or other factors may indicate that a decrease in value of the investment has occurred which is other than temporary and should be recognized.

59.     By the time it reported its financial results at the beginning of the Relevant Period, several of Riverstone's investments in telecommunications related companies had deteriorated dramatically as compared to their value.  Thus, the defendants were increasingly aware that the impairment in value was not temporary.

60.     Pursuant to GAAP, as set forth in APB No. 18 and Statement of Financial Accounting Standards No. 121, the Company was required to recognize a loss to reflect the non-temporary impairment.  Contrary to GAAP, the Individual Defendants caused Riverstone to not reflect such losses, as to do so would have so reduced the Company's earnings during the Relevant Period and would have been an admission that the Company's current business and future prospects were bleak, at best, and that the integration was a failure.

61.     Due to these accounting improprieties, the Individual Defendants also caused the Company to present its financial results and statements in a manner which violated additional GAAP standards, such as:

(a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶ 10);

(b)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASCON 1, ¶ 34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASCON 1, ¶ 40);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASCON 1, ¶ 50);

(e)     The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.   Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASCON 1, ¶ 42);

(f)     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (FASCON 2, ¶¶ 58-59);

(g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASCON 2, ¶ 79); and

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASCON 2, ¶¶ 95, 97).

62.     Further, the undisclosed adverse information concealed by defendants during the Relevant Period is the type of information which, because of SEC regulations, regulations of the

- 17 -

1   national stock exchanges and customary business practice, is expected by investors and securities

2   analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be

3   the type of information which is expected to be and must be disclosed.

4          63.    As a result of the Individual Defendants' actions, Riverstone's market capitalization has

5   been damaged by over $2.6 billion.  At the same time that the defendants were causing Riverstone to

6   suffer such devastation of its market capitalization, many of the Individual Defendants fared much

7   better by selling over $8.5 million of their personally held stock.

8          64.    On April 25, 2003, Riverstone announced that the Individual Defendants' conduct had

9   caused the SEC to request information on Riverstone's accounting practices related to "certain financial

10  transactions."  Shortly thereafter, the SEC launched a formal investigation and issued a formal order of

11  investigation to the Company.

12         65.    On May 28, 2003, the Individual Defendants caused Riverstone to announce that the

13  Company was delaying the filing of its Annual Report on Form 10-K for the fiscal year ended March 1,

14  2003, and its Quarterly Report for the first quarter of fiscal year 2004 on Form 10-Q with the SEC due

15  to an internal review of Riverstone's prior accounting practices.  The Company has yet to file these

16  reports.

17         66.    On August 26, 2003, the Individual Defendants published the accounting restatement of

18  the Company's net revenues for fiscal years 2002 and 2003.  This restatement is an admission that

19  Riverstone's financial statements for those fiscal years were materially false and misleading.

20  Riverstone publicly announced that:

21        [T]he company has determined that it overstated its previously reported net revenues
      for the fiscal year ended March 2, 2002 of $210.8 million by as much as $85.5
22        million and its previously reported net revenues for the nine months ended
      November 30, 2002 of $54.5 million by as much as $12.7 million.
23

24        In addition, the company has determined that previously announced net revenues for
      the fiscal year ended March 1, 2003 of $69.6 million were overstated by as much as
25        $13.3 million. The company anticipates a positive impact of as much as $700,000 on
      previously announced net revenues for the first quarter of fiscal 2004 ended May 31,
26        2003 of $12.7 million.

27        The overstatements are primarily related to revenue recognized on sales to customers
      in which the company made investments and sales that were subject to rights of
28        return, pricing discounts and other contingencies that were not accounted for at the

1  time the transactions were originally recorded. As a result, based on the company's
2  accounting policies, revenue related to these sales either should not have been
   recognized or should have been recognized in a different period.

3  The review of the company's accounting practices by a special committee of the
4  board of directors is ongoing. Based on that review, additional items may be restated.
   The company is currently unable to quantify the amounts of potential additional
5  restatements or the impact of any restatement, which will be material. As previously
   announced the Nasdaq Listing Qualifications Panel has determined to continue the
6  listing of Riverstone's securities on The Nasdaq National Market subject to
7  conditions prescribed by the Panel, including the condition that Riverstone file its
   Form 10-K for the year end March 1, 2003 and its Form 10-Q for the quarter ended
8  May 31, 2003, as well as any restatements for prior periods, by September 8, 2003.
   The company is attempting to conclude its review and issue any restatements
9  promptly, but it presently cannot state with any certainty when this will occur.
   Investors should not rely on the company's historical financial statements and
10 auditors' reports thereon or its financial results announced for any period.

11      67.     The announced financial restatement is an admission that the Company's previously
12
   reported financials were materially false and misleading. Thus, the Company's financials reported in its
13
   Quarterly and Annual Reports filed on Forms 10-Q and 10-K and filed with the SEC during its 2002
14
   and 2003 fiscal years were materially false and misleading.
15
        68.     The following reports filed with the SEC contained admittedly false and misleading
16
   financial statements:
17
                (a)     Quarterly Report, for the quarter ending June 2, 2001, filed with the SEC on July
18
   17, 2001 and approved and signed by Defendants Pereira and Stanton.
19
                (b)     Quarterly Report, for the quarter ending September 1, 2001, filed with the SEC
20
   on October 15, 2001 and approved and signed by Defendants Pereira and Stanton.
21
                (c)     Quarterly Report, for the quarter ending December 1, 2001, filed with the SEC on
22
   January, 15, 2002 and approved and signed by Defendants Pereira and Stanton.
23
                (d)     Annual Report, for the year ending March 2, 2002, filed with the SEC on May
24
   31, 2002 and approved and signed by Defendants Pereira, Stanton, Patel, del Calvo, Jaeger, and
25
   Paisley.
26
                (e)     Quarterly Report, for the quarter ending June 1, 2002, filed with the SEC on June
27
   25, 2002 and approved and signed by Defendants Pereira and Stanton.
28

- 19 -

(f)      Quarterly Report, for the quarter ending August 31, 2002, filed with the SEC on October 3, 2002 and approved and signed by Defendants Pereira and Stanton.  Furthermore, Pereira and Stanton falsely certified this Quarterly Report and the financials within it as true pursuant to Sarbanes-Oxley.

Quarterly Report, for the quarter ending November 30, 2002, filed with the SEC on January 14, 2003 and approved and signed by Defendants Pereira and Stanton. Furthermore, Pereira and Stanton falsely certified this Quarterly Report and the financials within it as true pursuant to Sarbanes-Oxley.

69.      On September 19, 2003, the Company received a letter in which the trustee for the Company's 3.75% convertible subordinated notes due 2006 asserts that an event of default has occurred under the related Indenture as a result of Riverstone's continued failure to file its Form 10-K as required by the Indenture within 60 days of receiving notice from the trustee. The trustee also purports to declare all amounts owing on the notes and under the Indenture to be immediately due and payable, and demands principal in the amount of $131,750,000 and interest and liquidated damages accrued to September 12, 2003 in the amount of $1,570,935.82.

## FALSE AND MISLEADING STATEMENTS
## DURING THE RELEVANT PERIOD

70.      Due to the Individual Defendants violations of GAAP, and in order to conceal those GAAP violations, the Individual Defendants published false and misleading financial information to the public and filed false and misleading statements with the SEC as identified below.

71.      On August 20, 2001, the Individual Defendants caused Riverstone to issue the following press release via *Business Wire*:

Hutchison Global Crossing Selects Riverstone Routers for World's First Metro MPLS Ethernet Network.

Nationwide Network to Deliver Advanced  Content and IP Services

Riverstone Networks, Inc., a pioneer in metropolitan area networking, today announced that Hong Kong-based Hutchison Global Crossing (HGC) selected Riverstone's advanced routing technology to create the world's first major metropolitan Multi-Protocol Label Switching (MPLS) Ethernet network.  By deploying Riverstone routers to create its metro network, HGC will manage and control bandwidth with unprecedented accuracy to deliver an extensive suite of advanced IP-based services to its customers. ***The deployment will initially provide nearly one million Hong Kong residents with last-mile Ethernet connectivity***. [Bold emphasis added.]

"The new Hutchison Global Crossing networks relies on MPLS as the cornerstone for provisioning its services, while leveraging the speed and simplicity of Ethernet, to create an optimal foundation for the profitable delivery of IP services," said Romulus Pereira, president and CEO of Riverstone Networks. "This state-of-the-art network will facilitate the creation and delivery of several exciting new services, positioning HGC to increase its revenue streams and grow its business into the future."

Riverstone will supply HGC with several hundred metro aggregation routers from the metro core to the access edge, including numerous RS 38000 optical metro backbone routers, which feature powerful service-creation tools and dynamic bandwidth provisioning capabilities. In addition to using RS 38000 routers in the metro core, HGC will incorporate RS 8600 multi-service metro routers for Point-of-Presence (POP) aggregation purposes, and RS 3000 metro access routers in building access applications. HGC will also leverage Riverstone technology to become the first carrier to launch an end-to-end MPLS metro network for content and service delivery.

"This is a very significant metro-optical Ethernet deployment," said David Gross, senior analyst at Communications Industry Researchers, Inc. "MPLS greatly improved traffic engineering in the long-haul IP core, and now Riverstone is leading the charge to bring MPLS to the metro Ethernet core. As service providers are forced to accelerate time to profitability, Riverstone has build a platform that can help them reach their financial objectives."

"Riverstone's vision and strategy have been consistent, and its early commitment to MPLS in its metrowide solutions was well timed to position the company for recent successes in Asian markets," said David Dunphy, senior analyst, Current Analysis. "Rapid buildout of metro networks in places like Hong Kong, where population density is high and fiber access is widely available, makes for significant opportunities in the current market. Service providers in the region have a large addressable market for new, differentiated, high-bandwidth services, and MPLS technology such as Riverstone's can give these companies an important tool – the means to deliver cost-effective Ethernet-based services with consistent service quality."

72.   On September 10, 2001, the Individual Defendants caused Riverstone to issue a press release via *Business Wire* which stated in relevant part:

Riverstone Networks, Inc., a pioneer in metropolitan area networking, furthered its lead in Multi-Protocol Label Switching (MPLS) technology for metropolitan area networks by shipping its 1,000th MPLS router port this week.

Riverstone is currently shipping MPLS-enabled routers to six different telecommunications carrier customers. This milestone follows Riverstone's August 2001 announcement that its advanced routers would be used by Hong Kong-based Hutchison Global Crossing to create the world's first metro MPLS network, ***providing nearly one million residents with last-mile Ethernet connectivity***. [Bold emphasis added.]

73.   On September 20, 2001, the Individual Defendants caused Riverstone to issue a press release entitled, "Riverstone Networks Reports Record Revenue, Delivers 169 Percent Year Over Year Growth, and Reaches Profitability Ahead of Expectations." The press release stated in part:

Riverstone Networks Inc. today reported revenues of $55.3 million for its second quarter fiscal 2002, which ended September 1, 2001, a 169 percent increase compared with revenues of $20.6 million for the same period last year and a 25 percent increase compared with revenues of $44.2 million for the prior quarter.

Pro forma net income for the quarter was $1.6 million or $0.01 per share, compared with a pro forma net loss of $8.4 million or $0.09 per share for the second quarter of fiscal 2001, and a pro forma net loss of $3.6 million or $0.03 per share for the prior quarter.

Actual net income for the second quarter, which includes stock-based compensation and amortization of goodwill, was $64,000 or breakeven on a per share basis. This compares with a net loss of $11.8 million or $0.13 per share for the second quarter of fiscal 2001.

"We are very pleased with our financial results," said Romulus Pereira, president and chief executive officer of Riverstone Networks. "Not only did we turn profitable a full quarter ahead of expectations, we grew revenue 169 percent on a year over year basis. We continue to win tier-one accounts around the world by delivering key technology offerings such as MPLS services, new high-density gigabit platforms and high-availability networking solutions. These achievements are establishing us as a premier provider of metropolitan area network equipment."

74.     The true facts which were known (or consciously disregarded) by each of the defendants but concealed from the public were as follows:

(a)     That the Company's financial results were materially false and misleading as described below;

(b)     That the Company's purported ability to reach one million customers via its deal with Hutchison was a pipe dream as Hutchison had less than 150,000 customers and its growth rate was less than 7% per month;

(c)     That the Company's revenue recognition policy was regularly disregarded in favor of the defendants' desire to ship products and report revenues even though the customer had little if any ability to pay;

(d)     That a substantial percentage of Riverstone's sales occurred in the last few days of the fiscal quarter, which allowed Riverstone to miraculously "make its numbers" through suspect transactions that should not have been recorded as revenue at that time;

(e)     That much of Riverstone's revenue reported during the quarter would have to be reversed because customers routinely returned products during the next fiscal quarter. For example, throughout the Relevant Period, Qwest Communications ("Qwest"), one of

- 22 -

Riverstone's largest customers, repeatedly returned product during the following quarter. Curiously, when Riverstone employees followed up with Qwest's end-customers to inquire into the reason for the return, the Qwest end-customers often did not even have a record of ever having received the product;

(f)     That the claimed reason for the product return by "end-of-the-quarter" customers was often that the products were "defective." However, the returned products were later placed back into inventory. Many of the customers who returned products would often re-order the exact same products and return them again later. Although Riverstone's product return policy provided for a 90-day return period, Riverstone accepted product returns for products that had been purchased over 120 days earlier; and

(g)     That many of the end-of-the-quarter transactions that allowed Riverstone to purportedly "make its numbers" were suspect deals that were put together by defendants Stanton or Pereira rather than sales made by Riverstone's sales representatives. The revenue from these end-of-the-quarter transactions should not have been recorded. Defendants knew that the end-of-the-quarter transactions were suspect because defendant Kern received bi-weekly pipeline reports from Riverstone's outside sales representatives. These bi-weekly pipeline reports contained the names of prospective customers that had a high potential of closing a deal with Riverstone. However, the suspect "end-of-the-quarter" deals put together by defendants Stanton and Pereira did not appear on these pipeline reports.

75.     Between September 6, 2001 and October 25, 2001, certain of the Insider Selling Defendants, based on their knowledge of this material, adverse, non-public information regarding the Company's statements, financial results, and condition, sold in California 290,529 shares of Riverstone common stock, collecting proceeds of $2,542,382.40, as follows:

| Name | Dates | # Shares | Prices | Proceeds |
|------|-------|----------|--------|----------|
| Piyush Patel | 9/6/2001 | 974 | $9.26 | $9,019.24 |
| | 9/6/2001 | 1,479 | $9.27 | $13,710.33 |
| | 9/25/2001 | 974 | $7.50 | $7,305.00 |
| | 9/25/2001 | 4,000 | $7.70 | $30,800.00 |

| | | | | |
|---|---|---:|---:|---:|
| 1 | | 9/25/2001 | 4,000 | $7.72 | $30,880.00 |
| 2 | | 9/25/2001 | 8,000 | $7.75 | $62,000.00 |
| 3 | | 9/26/2001 | 3,848 | $7.75 | $29,822.00 |
| 4 | | 9/26/2001 | 5,000 | $7.74 | $38,700.00 |
| 5 | | 9/26/2001 | 5,000 | $7.75 | $38,750.00 |
| 6 | | 10/2/2001 | 7,300 | $5.75 | $41,975.00 |
| 7 | | 10/5/2001 | 4,500 | $6.42 | $28,890.00 |
| 8 | | 10/8/2001 | 980 | $7.12 | $6,977.60 |
| 9 | | 10/8/2001 | 1,481 | $7.12 | $10,544.72 |
| 10 | | 10/9/2001 | 4,531 | $8.02 | $36,338.62 |
| 11 | | 10/11/2001 | 10,000 | $10.33 | $103,300.00 |
| 12 | | 10/11/2001 | 10,000 | $9.96 | $99,600.00 |
| 13 | | 10/11/2001 | 20,000 | $10.33 | $206,600.00 |
| 14 | | 10/12/2001 | 7,428 | $10.31 | $76,582.68 |
| 15 | | 10/12/2001 | 10,000 | $10.35 | $103,500.00 |
| 16 | | 10/15/2001 | 1,857 | $11.06 | $20,538.42 |
| 17 | | 10/15/2001 | 5,000 | $10.91 | $54,550.00 |
| 18 | | 10/15/2001 | 5,000 | $10.95 | $54,750.00 |
| 19 | | 10/15/2001 | 7,681 | $10.92 | $83,876.52 |
| 20 | | 10/15/2001 | 10,000 | $10.94 | $109,400.00 |

|  | | | | |
|---|---|---:|---:|---:|
| **Total:** | | 139,033 | | $1,298,410.10 |

| Suresh Gopalakrishnan | 10/15/2001 | 6,413 | $11.50 | $73,749.50 |
|---|---|---:|---:|---:|
| **Total:** | | 6,413 | | $73,749.50 |

| Romulus  Pereira | 10/12/2001 | 3,848 | $11.05 | $42,520.40 |
|---|---|---:|---:|---:|
| | 10/12/2001 | 9,620 | $11.05 | $106,301.00 |
| **Total:** | | 13,468 | | $148,821.40 |

| Eric Jaeger | 9/6/2001 | 288 | $9.26 | $2,666.88 |
|---|---|---:|---:|---:|
| | 9/25/2001 | 216 | $7.50 | $1,620.00 |
| | 9/25/2001 | 289 | $7.50 | $2,167.50 |
| | 9/25/2001 | 252 | $7.61 | $1,917.72 |
| | 9/25/2001 | 2,974 | $7.61 | $22,632.14 |

- 24 -

| Date | Shares | Price | Amount |
|---|---|---|---|
| 9/25/2001 | 8,500 | $7.62 | $64,770.00 |
| 9/25/2001 | 1,600 | $7.61 | $12,176.00 |
| 9/25/2001 | 3,174 | $7.61 | $24,154.14 |
| 9/26/2001 | 8,500 | $7.16 | $60,860.00 |
| 9/26/2001 | 8,500 | $7.03 | $59,755.00 |
| 10/1/2001 | 4,000 | $5.09 | $20,360.00 |
| 10/8/2001 | 10,000 | $8.31 | $83,100.00 |
| 10/8/2001 | 10,000 | $8.00 | $80,000.00 |
| 10/8/2001 | 20,000 | $7.92 | $158,400.00 |
| 10/8/2001 | 10,000 | $8.05 | $80,500.00 |
| 10/8/2001 | 10,000 | $8.25 | $82,500.00 |
| 10/8/2001 | 10,000 | $7.94 | $79,400.00 |
| 10/8/2001 | 288 | $7.12 | $2,050.56 |
| 10/11/2001 | 2,125 | $10.31 | $21,908.75 |
| 10/11/2001 | 8,233 | $10.31 | $84,882.23 |
| 10/24/2001 | 5,205 | $11.50 | $59,857.50 |
| 10/24/2001 | 1,058 | $11.50 | $12,167.00 |
| 10/25/2001 | 6,413 | $12.00 | $76,956.00 |
| **Total:** | 131,615 | | $1,021,401.40 |
| | | | |
| **TOTAL:** | **290,529** | | **$2,542,382.40** |

76.     On November 15, 2001, the Individual Defendants caused Riverstone to issue a press release entitled, "Riverstone Sells $150 Million of 3.75% Convertible Subordinated Notes."  The press release stated in part:

> Riverstone Networks, Inc. announced today that it agreed to privately place $150 million aggregate principal amount of 3.75% convertible subordinated notes due 2006. The notes will be unsecured obligations, convertible into Riverstone Common Stock at a conversion price of approximately $18.16 per share.  The company has granted the initial purchasers of the notes a 30-day option to purchase an additional $25 million principal amount of the notes.  The placement of the notes is expected to close on November 21, 2001.

77.     On December 19, 2001, the Individual Defendants caused Riverstone to issue a press release entitled, "Riverstone Networks Reports Record Third Quarter: Revenues Increase 124% Year Over Year to $60.1 Million, Company Reports Pro Forma Profit of $0.03 Per Share."  The press release stated in part:

> Riverstone Networks, Inc. today reported revenues of $60.1 million for its fiscal third quarter 2002, which ended December 1, 2001, a 124 percent increase compared

with revenues of $26.8 million for the same period last year and an 8.7 percent increase compared with revenues of $55.3 million for the prior quarter.

Pro forma net income for the quarter was $3.6 million or $0.03 per share, compared with a pro forma net loss of $7.1 million or $0.08 per share for the third quarter of fiscal 2001, and a pro forma net income of $1.6 million or $0.01 per share for the prior quarter.

GAAP net income for the third quarter, which includes stock-based compensation and amortization of goodwill, was $2.2 million or $0.02 per share. This compares with a net loss of $34.9 million or $0.38 per share for the third quarter of fiscal 2001. GAAP net income for the prior quarter was $64,000, or breakeven on a per share basis.

"We are pleased to deliver another record quarter of increasing revenues, profit and market share," said Romulus Pereira, Riverstone president and chief executive officer. "Riverstone continues to set the standard for carrier products in the metro market. Our solutions enable our customers to create and deliver profitable services, lower costs, and maximize returns from their infrastructure."

78.     The true facts which were known (or consciously disregarded) by each of the defendants but concealed from the public were as follows:

(a)     That the Company's financial results were materially false and misleading as described below;

(b)     That the Company's purported ability to reach one million customers via its deal with Hutchison was a pipe dream as Hutchison had less than 150,000 customers and its growth rate was less than 7% per month;

(c)     That the Company's revenue recognition policy was regularly disregarded in favor of the defendants' desire to ship products and report revenues even though the customer had little if any ability to pay;

(d)     That a substantial percentage of Riverstone's sales occurred in the last few days of the fiscal quarter, which allowed Riverstone to miraculously "make its numbers" through suspect transactions that should not have been recorded as revenue at that time;

(e)     That much of Riverstone's revenue reported during the quarter would have to be reversed because customers routinely returned products during the next fiscal quarter. For example, throughout the Relevant Period, Qwest, one of Riverstone's largest customers, repeatedly returned product during the following quarter. Curiously, when Riverstone

employees followed up with Qwest's end-customers to inquire into the reason for the return, the Qwest end-customers often did not even have a record of ever having received the product;

(f)    That the claimed reason for the product return by "end-of-the-quarter" customers was often that the products were "defective."  However, the returned products were later placed back into inventory.  Many of the customers who returned products would often re-order the exact same products and return them again later.  Although Riverstone's product return policy provided for a 90-day return period, Riverstone accepted product returns for products that had been purchased over 120 days earlier; and

(g)    That many of the end-of-the-quarter transactions that allowed Riverstone to purportedly "make its numbers" were suspect deals that were put together by defendants Stanton or Pereira rather than sales made by Riverstone's sales representatives.  The revenue from these end-of-the-quarter transactions should not have been recorded.  Defendants knew that the end-of-the-quarter transactions were suspect because defendant Kern received bi-weekly pipeline reports from Riverstone's outside sales representatives.  These bi-weekly pipeline reports contained the names of prospective customers that had a high potential of closing a deal with Riverstone.  However, the suspect "end-of-the-quarter" deals put together by defendants Stanton and Pereira did not appear on these pipeline reports.

79.    On December 20, 2001, Riverstone's common stock price closed at $15.05.  The price of Riverstone's stock rose until January 11, 2002, when it reached a Relevant-Period high of $20.55 per share.  Immediately, certain of the Insider Selling Defendants began selling their shares.

80.    Between January 11, 2002 and February 1, 2002, each of the Insider Selling Defendants, based on their knowledge of this material, adverse, non-public information regarding the Company's statements, financial results, and condition, sold in California 326,800 shares of Riverstone common stock, collecting proceeds of $5,985,341.90 as follows:

| Name | Dates | # Shares | Prices | Proceeds |
|------|-------|----------|--------|----------|
| Piyush Patel | 1/11/2002 | 57,300 | $20.26 | $1,160,898.00 |
|  | 2/01/2002 | 7,500 | $16.37 | $122,775.00 |

| | | Date | Shares | Price | Amount |
|---|---|---|---|---|---|
| 1 | | 2/01/2002 | 49,800 | $16.37 | $815,226.00 |
| 2 | **Total:** | | 114,600 | | $2,098,899.00 |
| 3 | | | | | |
| 4 | Suresh Gopalakrishnan | 1/11/2002 | 15,000 | $20.26 | $303,900.00 |
| 5 | | 2/01/2002 | 15,000 | $16.37 | $245,550.00 |
| 6 | **Total:** | | 30,000 | | $549,450.00 |
| 7 | | | | | |
| 8 | Romulus  Pereira | 1/11/2002 | 6,200 | $20.26 | $125,612.00 |
| 9 | | 1/11/2002 | 8,049 | $20.26 | $163,072.74 |
| 10 | | 1/11/2002 | 30,951 | $20.26 | $627,067.26 |
| 11 | | 2/01/2002 | 2,381 | $16.37 | $38,976.97 |
| 12 | | 2/01/2002 | 6,200 | $16.37 | $101,494.00 |
| 13 | | 2/01/2002 | 36,619 | $16.37 | $599,453.03 |
| 14 | **Total:** | | 90,400 | | $1,655,675.90 |
| 15 | | | | | |
| 16 | Eric Jaeger | 1/11/2002 | 15,000 | $20.26 | $303,900.00 |
| 17 | | 2/1/2002 | 15,000 | $16.37 | $245,550.00 |
| 18 | **Total:** | | 30,000 | | $549,450.00 |
| 19 | John Kern | 1/11/2002 | 1,948 | $20.26 | $39,466.48 |
| 20 | | 1/11/2002 | 10,952 | $20.26 | $221,887.52 |
| | | 2/01/2002 | 2,380 | $16.37 | $38,960.60 |
| 21 | | 2/01/2002 | 10,520 | $16.37 | $172,212.40 |
| | **Total:** | | 25,800 | | $472,527.00 |
| 22 | Robert Stanton | 1/11/2002 | 18,000 | $20.26 | $364,680.00 |
| 23 | | 2/01/2001 | 18,000 | $16.37 | $294,660.00 |
| | **Total:** | | 36,000 | | $659,340.00 |
| 24 | | | | | |
| 25 | **TOTAL:** | | **326,800** | | **$5,985,341.90** |
| 26 | | | | | |
| 27 | | | | | |
| 28 | | | | | |

- 28 -

81.     On February 28, 2002, only twenty-seven days after the insider selling had been completed, the Individual Defendants caused Riverstone to issue a press release entitled, "Riverstone Networks Announces Preliminary Fourth Quarter Results."  The press release stated in part:

> Riverstone Networks, Inc., a leader in metropolitan area networking, today announced that it expects revenues for the fourth quarter ending March 2, 2002 to be approximately $50 million to $54 million.  Based on these revenues, the Company anticipates it will breakeven or have a slight loss on a pro forma basis.  These pro forma results exclude fourth quarter charges, as well as amortization of goodwill and stock compensation expense.
>
> The Company also announced that it would reduce its expenses, including workforce reductions, resulting in an approximate 10 percent reduction in the Company's overall cost structure in the first quarter of fiscal 2003, which ends June 1, 2002.   The Company expects to take charges in the fourth quarter totaling approximately $26 million to $30 million, consisting of asset impairments, write downs in equity investments, charges related to discontinued products and costs associated with workforce reductions.
>
> Riverstone's revised expectations are a result of deteriorating market conditions, primarily in the US and Europe, which  have caused service providers and carriers to delay infrastructure build outs.  Despite the macro economic climate, carriers continue to choose Riverstone for its industry leading metro-optimized products and solutions.
>
> "We continue to focus on our financial metrics and remain committed to long-term profitability," said Romulus Pereira, President and CEO of Riverstone Networks. 'We also remain committed to our carrier customers and to providing them with network infrastructure that converts raw bandwidth into profitable services."

82.     After this announcement, the price of Riverstone's common stock closed at $3.82 per share.

83.     On March 26, 2002, the Individual Defendants caused Riverstone to issue a press release entitled, "Riverstone Networks Reports Fourth Quarter and Fiscal Year End 2002 Results; Company Reports Fiscal 2002 Revenues of $210.8 million, a 114 Percent Increase Over Previous Year."  The press release stated in part:

> Riverstone Networks, Inc., a pioneer in metropolitan area networking, today reported results for its fourth quarter and fiscal year ended March 2, 2002.
>
> Revenues for the fourth quarter of fiscal 2002 were $51.3 million, compared with revenues of $35.1 million for the same period last year and $60.1 million for the third quarter of fiscal 2002.  Pro forma net loss for the quarter was $1.7 million or $0.01 per share, compared with pro forma net loss of $5.5 million or $0.06 per share for the fourth quarter of fiscal 2001, and pro forma net income of $3.6 million, or $0.03 per share for the third quarter of fiscal 2002.
>
> GAAP net loss for the fourth quarter, which includes a charge of $1.1 million relating to stock-based compensation and goodwill associated with acquisitions, a

restructuring charge of $3.3 million, and a non-cash charge of $22.1 million related to the impairment of investments in privately-held companies, was $28.2 million, or $0.23 per share.  This compares with a GAAP net loss of $6.6 million or $0.07 per share for the fourth quarter of fiscal 2001 and GAAP net income of $2.2 million or $0.02 per share for the third quarter of fiscal 2002.

Revenues for the year ended March 2, 2002 were $210.8 million, a 114 percent increase compared with revenues of $98.3 million for fiscal 2001.  Pro forma net loss for fiscal 2002 was $252,000, or breakeven on a per share basis, compared with pro forma net loss of $32.8 million or $0.35 per share for fiscal 2001.

GAAP net loss for the year, which includes a charge of $5.0 million relating to stock-based compensation and goodwill associated with acquisitions, a restructuring charge of $3.3 million, and *a non-cash charge of $22.1 million related to the impairment of investments in privately-held companies*, was $30.7 million, or $0.27 per share.  This compares with a GAAP net loss of $65.8 million or $0.71 per share for fiscal 2001. [Bold emphasis added.]

84.     On March 27, 2002, defendant Pereira was interviewed by CNBC.  A portion of the published report of that interview follows:

Riverstone Networks, Inc. Chief Executive Officer Romulus Pereira said on financial news network CNBC that the maker of gear to direct Internet traffic expects to break even or post a small profit in the current quarter.

"We're fairly well diversified and we've got new market segments like Canada and Latin America starting to open up," Pereira said.  "*There's plenty of mid-tier business as well as good tier-one business in Asia to keep the revenue moving until the U.S. markets come back in force*."

*Pereira said the Company has $450 million in cash on hand.*

85.     The above statements were materially false and misleading because the Individual Defendants actually knew that:

(a)     The Company's Asian business had materially deteriorated and had become so dire that many of the Company's Asian clients could not even pay amounts owed to the Company;

(b)     The Company had only a fraction of the claimed "$450 million in cash";

(c)     The Company's financial results were materially false and misleading as described below;

(d)     That much of Riverstone's revenue reported during the quarter would have to be reversed because customers routinely returned products during the next fiscal quarter.  For example, throughout the Relevant Period, Qwest, one of Riverstone's largest customers,

repeatedly returned product during the following quarter.  Curiously, when Riverstone employees followed up with Qwest's end-customers to inquire into the reason for the return, the Qwest end-customers often did not even have a record of ever having received the product;

(e)     That the claimed reason for the product return by "end-of-the-quarter" customers was often that the products were "defective."  However, the returned products were later placed back into inventory.  Many of the customers who returned products would often re-order the exact same products and return them again later.  Although Riverstone's product return policy provided for a 90-day return period, Riverstone accepted product returns for products that had been purchased over 120 days earlier; and

(f)     That many of Riverstone's end-of-the-quarter transactions were suspect deals that were put together by defendants Stanton or Pereira rather than sales made by Riverstone's sales representatives.  The revenue from these end-of-the-quarter transactions should not have been recorded.  Defendants knew that the end-of-the-quarter transactions were suspect because defendant Kern received bi-weekly pipeline reports from Riverstone's outside sales representatives.  These bi-weekly pipeline reports contained the names of prospective customers that had a high potential of closing a deal with Riverstone.  However, the suspect "end-of-the-quarter" deals put together by defendants Stanton and Pereira did not appear on these pipeline reports.

86.     In fact, in May 2002, Pereira held an all-company meeting in which he announced that all employees would be taking a mandatory 5% pay deduction in the form of a payroll deduction. Pereira announced that this payroll deduction was necessary because business was very slow.

87.     Moreover, in May 2002, Cox Communications returned at least $3 million worth of product out of a $9 million order it placed with Riverstone earlier in 2002.

88.     On June 5, 2002, the Individual Defendants caused Riverstone to issue a press release entitled, " Riverstone Networks Announces Preliminary First Quarter Results."  The press release stated in part:

> Riverstone Networks, Inc., a leader in metropolitan area networking, today announced estimated financial results for the first quarter of fiscal 2002, which ended June 1, 2002.

Reflecting continued cautious spending on the part of telecommunications carriers, the Company expects revenue for the first quarter to be approximately $30 million to $31 million.  Based on these revenues, the Company expects to report a pro forma net loss for the quarter of approximately $0.11 per share to $0.13 per share, excluding amortization of goodwill and stock compensation expense.

"Despite capital spending remaining conservative, we continue to see strong initial deployments from carriers around the world, indicating that metro projects are a priority," said Romulus Pereira, president and chief executive officer of Riverstone Networks.  "Accordingly, our focus remains on delivering best-in-class products and solutions.  With a strong cash balance, we are well positioned to meet the next-generation networking needs of carriers around the world."

89.  On June 19, 2002, the Individual Defendants caused Riverstone to issue a press release entitled, "Riverstone Networks Reports First Quarter Fiscal 2003 Results; Results in Line With Previously Announced Expectations; Revenues of $30.1 Million and Pro Forma EPS of $(0.12)."  The press release stated in part:

Metropolitan area networking pioneer Riverstone Networks Inc. today reported first quarter results for the period ending June 1, 2002.

Revenues for the first quarter of fiscal 2003 were $30.1 million, compared with revenues of $44.2 million for the same period last year and $51.3 million for the fourth quarter of fiscal 2002.  Pro forma net loss for the quarter was $15.3 million or $0.12 per share, compared with pro forma net loss of $3.6 million or $0.03 per share for the first quarter of fiscal 2002, and pro forma net loss of $1.7 million, or $0.01 per share for the fourth quarter of fiscal 2002.

GAAP net loss for the first quarter was $15.9 million, or $0.13 per share.  This compares with a GAAP net loss of $4.7 million or $0.04 per share for the first quarter of fiscal 2002 and GAAP net loss of $28.2 million or $0.23 per share for the fourth quarter of fiscal 2002.

"While telecommunications carrier spending remains cautious, their priorities continue to reflect the shift from voice to data networks," said Romulus Pereira, president and chief executive officer of Riverstone Networks.  "Riverstone's product portfolio and strong customer base position us well as carriers around the world prepare to build the next generation service network."

90.  On August 22, 2002, the Individual Defendants caused Riverstone to issue a press release entitled, "Riverstone Networks Announces Preliminary Second Quarter Results and Restructures Operations."  The press release stated in part:

Riverstone Networks, Inc., today announced that it expects revenues for the second quarter ending August 31, 2002 to be approximately $10 million to $15 million. Based on these revenues, *the Company anticipates a pro forma loss of approximately $0.18 to $0.24 per share* and a GAAP loss of approximately $0.23 to $0.29 per share. Pro forma results exclude second quarter charges of approximately $5 million for severance expenses and charges associated with excess facilities, as well as amortization of stock compensation expense. [Bold emphasis added.]

- 32 -

To align its organization to pursue new market opportunities and accelerate its return to profitability, the Company is implementing a worldwide workforce reduction of approximately 30 percent of the Company's employee base. As a result of this reduction in workforce, the Company expects to realize cost savings of approximately $7 million per quarter beginning in the third quarter of the current fiscal year.

The Company also announced today that it is expanding its focus on adjacent markets that require Riverstone's advanced switching and routing technologies. These opportunities, which include federal and cable, are markets where Riverstone's products and services have an established growth profile.

"While we remain committed long term to our service provider customers, we are seeing a more immediate opportunity for our products in markets beyond telecommunications services," said Romulus Pereira, president and CEO of Riverstone Networks. "We believe we remain well positioned for long term success with a strong cash balance, a broad set of market opportunities, and a compelling set of next generation products."

91.    On September 18, 2002, the Individual Defendants caused Riverstone to issue a press release entitled, "Riverstone Networks Reports Second Quarter Fiscal 2003 Results." The press release stated in part:

Metropolitan area networking pioneer Riverstone Networks Inc. today reported second quarter results for the period ending August 31, 2002.

Revenues for the second quarter of fiscal 2003 were $10.7 million, compared with revenues of $55.3 million for the same period last year and $30.1 million for the first quarter of fiscal 2003. ***Pro forma net loss for the quarter was $38.5 million or $0.31 per share***, compared with pro forma net income of $1.6 million or $0.01 per share for the second quarter of fiscal 2002, and pro forma net loss of $15.3 million, or $0.12 per share for the first quarter of fiscal 2003. [Bold emphasis added.]

GAAP net loss for the second quarter, which includes a charge of $618,000 relating to stock-based compensation, a restructuring charge of $8.3 million, and ***a non-cash charge of $10.7 million related to the impairment of investments in privately-held companies***, was $58.0 million, or $0.47 per share. This compares with GAAP net income of $64,000 or breakeven on a per share basis for the second quarter of fiscal 2002 and GAAP net loss of $15.9 million or $0.13 per share for the first quarter of fiscal 2003. [Bold emphasis added.]

"Continued weakness and project delays in the telecommunications sector contributed to this quarter's revenue shortfall," said Romulus Pereira, president and chief executive officer of Riverstone Networks. "As a result, we have taken the necessary steps to better align our expenses with our revenues and we have placed a priority on minimizing cash burn, which decreased to $24 million from $35 million last quarter. With a strong cash balance of $387 million, best-in-class products, and a well-established customer base, we believe we are well positioned to return to profitability when the market recovers."

1      92.     On December 18, 2002, the Individual Defendants caused Riverstone to issue a press

2 release entitled, "Riverstone Networks Reports Third Quarter Fiscal 2003 Results; Revenues Increase

3 29 Percent Sequentially to $13.8 Million."  The press release stated in part:

4           Metropolitan area networking pioneer Riverstone Networks, Inc. today reported
          third quarter results for the period ending November 30, 2002.

5

6           Revenues for the third quarter of fiscal 2003 were $13.8 million, an increase of
          29 percent over revenues of $10.7 million in the prior quarter. Revenues for the third
          quarter of fiscal 2002 were $60.1 million.

7

8           GAAP net loss for the third quarter was $27.8 million or $0.23 per share. This
          compares to second quarter fiscal 2003 GAAP net loss of $58.0 million, or $0.47 per
          share and third quarter fiscal 2002 GAAP net income of $2.2 million or $0.02 per share.

9           Third quarter fiscal 2003 GAAP net loss includes a $6.3 million gain, net of tax, on debt
          retirement, an $11.5 million gain from the settlement of a lawsuit, a bad debt reserve of

10          $9.8 million, a $580,000 stock-based compensation charge, and ***impairment charges of
          $24.3 million related to investments in privately-held companies.*** [Bold emphasis

11          added.]

12          "During the third quarter we made noticeable progress on our priorities to extend
          our worldwide geographic reach and increase our penetration into both the

13          telecommunication and mission critical networking markets," said Romulus Pereira,
          president and CEO of Riverstone Networks. "While the worldwide marketplace remains

14          soft, new customers such as the Pentagon and Telefonica de Espana give us confidence
          in both our strategy and the resiliency of the market."

15

16          Riverstone also announced today that it has entered into an agreement to acquire
          privately held Pipal Systems, a Santa Clara, Calif.-based development stage networking

17          company. Founded in 2001 by veterans of several leading networking companies,
          including Nortel Networks, Shasta Networks, and Redback Networks, Pipal Systems is

18          developing a new generation of advanced Ethernet and MPLS technologies that are
          expected to bring enhanced network functionality and service creation capabilities to

19          carrier, campus metro and other mission critical networks.

20          The agreement was approved by the boards of directors of both companies and is
          expected to close in the fourth quarter of fiscal 2003 pending the approval of Pipal's

21          shareholders and the satisfaction of customary closing conditions. Under the terms of
          the deal, the consideration is comprised of 8 million shares of Riverstone common

22          stock, $3.5 million in cash payable to Pipal shareholders, the assumption of debt totaling
          approximately $6.5 million, and approximately $5.8 million in compensatory and bonus

23          arrangements tied to milestones for employees.

24      93.     On April 25, 2003, Riverstone announced that the Individual Defendants' conduct had

25 caused the SEC to request information on Riverstone's accounting practices related to "certain financial

26 transactions."  The SEC informed Riverstone that a formal investigation on the same topic could be

27 launched.

28

## <u>DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS</u>

94.     Plaintiff brings this action derivatively in the right and for the benefit of Riverstone to redress injuries suffered, and to be suffered, by Riverstone as a direct result of the breaches of fiduciary duty, Sarbanes-Oxley, and other violations of common and statutory law.  Riverstone is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

95.     Plaintiff will adequately and fairly represent the interests of Riverstone in enforcing and prosecuting its rights.

96.     Plaintiff is and was an owner of the stock of Riverstone during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

97.     The Board of Directors of Riverstone at the time of the filing of the original complaint consisted of the following seven individuals: Defendants Pereira, Patel, del Calvo, and Paisley, and recently appointed directors William Weyand, Sylvia Summers, and Richard Lowenthal.  Plaintiff did not make any demand on that Board of Directors of Riverstone to institute this action because such a demand would have been a futile, wasteful, and useless act, particularly for the following reasons:

(a)     Pereira is not independent or disinterested and could not have adequately considered a shareholder demand.  Pereira, as the President and CEO, was in insider. Moreover, because of Periera's Company stock ownership and executive positions with the Company, Riverstone's Proxy Statement for the 2002 Annual Shareholder Meeting admitted that he was not independent.

(b)     Pereira orchestrated the end-of-quarter sham sales as described in this Complaint. Through his study of sales, quality, and RMA reports he had direct knowledge of the massive product returns.  Additionally, he personally observed the renovations of office space to accommodate retuned product and the use of office cubicle space to house these returns as well.

(c)     Pereria also participated in Company meetings in which the massive product returns and bogus sales figures were discussed, and reviewed minutes from these meetings as well.  Indeed, Pereria was especially concerned about the Company's major accounts (such as

Cox Communications, Global Crossing, Verizon, and Qwest), and often asked to review Company reports specific to them.

(d)     Pereria also had knowledge of the GAAP violations via his access to Riverstone's Oracle and Remedy databases, and the Company's internal web site that reported duplicative shipments and massive product returns.

(e)     Pereira personally benefited from his misconduct and the wrongdoings alleged in this Complaint.  For the year ended March 2, 2002, Riverstone paid Pereira $229,327 in salary and granted him 13,468 options to purchase Riverstone stock.  For the year ended March 2, 2002, Pereira also acquired 103,868 Riverstone shares on option exercises, immediately realizing $1,420,395.  Additionally, during the Relevant Period, Pereira sold 103,868 shares of Riverstone stock for proceeds of $1,804,497.  These insider sales were extremely suspicious because they increased Pereira's annual income nearly ten-fold.

(f)     Pereira authorized and signed off on the false and misleading reports filed with the SEC on Forms 10-Q and 10-K for the fiscal years of 2002 and 2003.  Furthermore, he falsely certified the quarterly reports filed with the SEC on October 3, 2002, and January 14, 2003 pursuant to Sarbanes-Oxley.

(g)     Patel is not independent or disinterested and could not have adequately considered a shareholder demand.  Indeed, the Company's Proxy Statement for the 2002 Annual Shareholder Meeting admitted that he was not independent because of his service to Cabletron as its Chairman of the Board, President and CEO from October 1998 to June 1999.

(h)     Patel is also interested in the wrongs alleged in this Complaint, because he had knowledge of the wrongdoing and personally benefited from it.  As a member of the Board, Patel attended at least nine Board meetings in 2002 and 2003 and four Audit Committee meetings.   As a result, Patel observed the Company's office renovations intended to accommodate the enormous product returns, and he saw the returned product housed in office cubicles.  To that end, Patel had knowledge of and participated in the wrongdoing alleged in this Complaint, and personally benefited from his misconduct.   During the Relevant Period, Patel participated in the issuance of false and/or misleading statements, including the preparation of

false and/or misleading press releases and SEC filings.  During the Relevant Period, Patel sold 253,633 shares of Riverstone stock for proceeds of $3,397,309.

(i)     Patel also directly participated in the wrongdoing alleged in this Complaint by approving and signing the false and misleading Annual Report filed on Form 10-K with the SEC on May 31, 2002.

(i)     Patel, del Calvo, and Paisley were members of the Company's Audit Committee.

(ii)    Pillsbury is and has been the primary outside corporate and securities counsel for Riverstone.  de Calvo, as a partner at Pillsbury, lacked independence to be a member of the audit committee.[3]

(iii)   Patel, del Calvo, and Paisley were present in the Company's offices on at least nine occasions for Board meetings in 2002, and also attended at least four Audit Committee meetings in that year.  Thus, they each observed the office renovations necessary to accommodate the massive product returns and storage of returned product in office cubicles.  Moreover, as members of the Audit Committee they each had oversight responsibility over the Company's accounting and financial reporting principles and policies and internal audit controls and procedures.  To that end, they each discussed with management, including its CEO, Pereira, and CFO, Stanton, and its internal audit group the Company's quarterly and annual financial statements, and internal and external audit controls.  Furthermore, they each had knowledge of, through their access to sales, quality and RMA reports of the sham end-of-quarter sales and enormous product returns.

---

[3] In a April 25, 2003 Client Alert from Pillsbury entitled "Sarbanes-Oxley Act: Standards Relating to Listed Company Audit Committees", de Clavo's firm states "For example, where a partner of a law firm serves on an issuer's audit committee, that law firm would be unable to represent the issuer, regardless of whether or not the partner on the audit committee is involved directly with the representation of the issuer."

(iv)     Patel, del Calvo, and Paisley also directly participated in the wrongful actions alleged in this Complaint by approving and signing the false and misleading Annual Report filed on Form 10-K with the SEC on May 31, 2002.

(v)     Defendant Paisley, as the CFO of 3Com Corporation ("3Com"), was sophisticated and knowledgeable about the proper procedures and standards for the recognition of revenue.  Specifically, defendant Paisley was well aware of the harm done to a company by improper accounting, as he was a defendant in litigation against 3Com regarding that company's improper deferral of revenue and improper recognition of revenue, both actions taken in violation of GAAP.  That litigation cost 3Com over $200 million to settle.  Despite these defendants' knowledge and duties, the Audit Committee recommended to the Board of Directors that the Company's audited consolidated financial statements be included in its Annual Report on Form 10-K for the fiscal year ended March 3, 2001, and be filed with the SEC.  By such actions, defendants Patel, del Calvo and Paisley breached their duties by causing or allowing the improper financials described above.

(j)     In Riverstone's Form 8-K, filed with the SEC on or about August 26, 2003, the Board of Directors stated that the above caption case had been filed and "***The Company intends to vigorously defend these proceedings***." (Emphasis added).  On August 26, 2003, the date this Form 8-K was filed, defendants Pereira, Patel, del Calvo, Paisley, Weyand, Summers, and Lowenthal were each members of the Riverstone Board of Directors.  Their statement to "vigorously defend" these proceedings is evidence of their antagonism toward them, and why a shareholder demand would have been futile.

(k)     On October 16, 2002, Weyand was appointed to the Board of Directors.  Weyand is not independent given he was appointed to the Board by those clearly not independent or disinterested, and has not been elected by Riverstone's shareholders.

(l)     On October 21, 2002, Summers was appointed to the Board of Directors. Summers is not independent given she was appointed to the Board by those clearly not independent or disinterested, and has not been elected by Riverstone's shareholders.

- 38 -

(m)     On February 6, 2003, Lowenthal was appointed to the Board of Directors. Lowenthal is not independent given he was appointed to the Board by those clearly not independent or disinterested, and has not been elected by Riverstone's shareholders. Moreover, Lowenthal was appointed to the Board after he sold his company, Pipal Systems, Inc. to Riverstone in January 2003. For these reasons, he is not independent.

(n)     The Board of Directors, because of their inter-related business and professional relationships, have developed debilitating conflicts of interest which have prevented the Board of Directors' members of the Company from taking the necessary and proper action on behalf of the Company as requested herein. In addition to the conflicts that existed as a result of their participation in the improper insider selling, as detailed herein *supra*, the majority of the Board of Directors, including the defendants listed below, were subject to the following prejudicial entanglements:

(i)     ***Pereira and Patel Are Long-Time Business Associates***: In September 1996, defendants Pereira and Patel, along with Nilesh Shah, founded Yago. From September 1996 to March 1998, defendant Pereira served as CTO and Vice President of Engineering of Yago. From September 1996 to October 1998, defendant Patel served as the CEO of Yago. In March 1998, defendants Pereira and Patel agreed to sell Yago to Cabletron for $213 million. At that time, defendants Pereira and Patel each owned 1,600,000 shares of Yago, or 9%. As a result of their ownership of Yago, defendants Pereira and Patel each received $19,170,000. Because of their long-standing and personally beneficial business and professional relationships, neither defendant Pereira nor defendant Patel would have taken the action requested by plaintiff herein against one another or the remainder of the Individual Defendants;

(ii)     ***Pereira and Patel Have Further Long-Time Business Relationships***: From December 1998 to September 2000, defendant Pereira served as General Manager of Cabletron's service provider business. From September 1999 to February 2000, defendant Pereira also served as Chief Operating Officer at Cabletron. From October 1998 to June 1999, defendant Patel served as Senior Vice President of Worldwide

- 39 -

Engineering at Cabletron.  Since June 1999, defendant Patel served as the Chairman of the Board, President and CEO of Cabletron.  Because of their long-standing and personally beneficial business and professional relationships, neither defendant Pereira nor defendant Patel would have taken the action requested by plaintiff herein against one another or the remainder of the Individual Defendants; and

(iii)     ***Pereira, Patel, and del Calvo Are Long-Time Business Associates***: Defendant del Calvo is a partner at Pillsbury, where he currently serves as co-chair of Pillsbury's Silicon Valley Business Group.  Defendant del Calvo joined Pillsbury in 1982 and was made a partner in 1990.  At Pillsbury, defendant del Calvo represented Yago in its merger with Cabletron in March 1998.  Currently, Pillsbury is Riverstone's primary outside corporate and securities counsel.  Defendant del Calvo has received and continues to receive substantial compensation due to his relationship with defendants Pereira and Patel.  Even as recently as April 4, 2003, Pillsbury passed upon the validity of the $126,525,000 in 3.75% convertible subordinated note offering and the common stock issuable upon conversion of the notes.  Due to these longstanding and personally beneficial business relationships with defendants Pereira and Patel, defendant del Calvo lacks independence from these directors and any demand upon him was futile.

98.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the Board of Directors have failed and refused to seek to recover for Riverstone for any of the wrongdoing alleged by plaintiff herein.

99.     Plaintiff has not made any demand on shareholders of Riverstone to institute this action since such demand would be a futile and useless act for the following reasons:

(a)     Riverstone is a publicly held company with approximately 130 million shares outstanding and thousands of shareholders;

(b)     Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)    Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against the Insider Selling Defendants for Violation of<br>California Corporations Code Section 25402

100.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

101.    At the time that defendants Pereira, Patel, Gopalakrishnan, Jaeger, Kern, and Stanton ("Insider Selling Defendants") sold their Riverstone common stock as set forth herein, by reason of their high executive and/or directorship positions with Riverstone, the Insider Selling Defendants had access to highly material information regarding the Company, including the information set forth herein regarding the true adverse facts of Riverstone's improper accounting and statements.

102.    At the time of such sales, that information was not generally available to the public or the securities markets.  Had such information been generally available, it would have significantly reduced the market price of Riverstone shares at that time.

103.    The Insider Selling Defendants, and each of them, had actual knowledge of material, adverse non-public information and thus sold their Riverstone common stock in California in violation of California Corporations Code § 25402.

104.    Pursuant to California Corporations Code § 25502.5, the Insider Selling Defendants, and each of them, are liable to Riverstone for damages in an amount up to three times the difference between the price at which Riverstone common stock was sold by the defendants, and each of them, and the market value which that Riverstone common stock would have had at the time of the sale if the information known to the defendants, and each of them, had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

## COUNT II

### Against the Insider Selling Defendants for Breach of Fiduciary<br>Duties for Insider Selling and Misappropriation of Information

105.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

106.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Riverstone common stock on the basis of such information.

107.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Riverstone common stock.

108.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's statements and financial statements were improper.  The Insider Selling Defendants' sales of Riverstone common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

109.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT III

### Against All Defendants for Breach of Fiduciary Duty

110.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

111.    The Individual Defendants owed and owe Riverstone fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Riverstone the highest obligation of good faith, fair dealing, loyalty, and due care.

112.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

113.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported statements and financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

114.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Riverstone has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

115.    Plaintiff on behalf of Riverstone has no adequate remedy at law.

## COUNT IV

### Contribution And Indemnification

116.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

117.    Riverstone alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to Individual Defendants' liability to Riverstone.

118.    Riverstone's alleged liability on account of the wrongful acts and practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Individual Defendants as alleged above, and Riverstone is entitled to contribution and indemnification from each of the Defendants in connection with all such claims that have been, are or may in the future be asserted against Riverstone by virtue of the Individual Defendants' misconduct.

## COUNT V

### Against Defendants Pereira And Stanton
### Pursuant To 15 U.S.C. § 7243 (Sarbanes-Oxley)

119.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

120.    Based upon the allegations made above and pursuant to 15 U.S.C. § 7324, Riverstone is entitled to reimbursement of all bonuses and other incentive-based or equity based compensation paid to Pereira and Stanton, and any profits realized from the sale of Riverstone securities by them.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT VI

### Against Defendants Pereira And Stanton
### For Breaches Of Fiduciary Duty And Trading On Confidential
### <u>Information For Personal Profit</u>

121.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

122.    Pereira and Stanton occupied fiduciary positions with Riverstone that made them privy to confidential material inside information concerning the Company and its operations, including the wrongful conduct alleged herein, and the Company's potential exposure to liability and injury.

123.    In spite of their duty to refrain from trading in the Company's stock based upon inside information, these defendants sold millions of dollars worth of their personal holdings in Riverstone securities.

124.    As such, Pereira and Stanton are liable and must account to Riverstone for any and all profits they unlawfully derived from these stock sales.

## COUNT VII

### Against Defendants Pereira And Stanton
### For Breaches Of Fiduciary Duty Arising Out Of The Payment
### <u>Of Incentive Based Compensation</u>

125.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126.    Pereira and Stanton received incentive based compensation based upon the financial performance of the Company which they knew was artificially inflated due to the reasons alleged herein.  They each owed a fiduciary duty to the Company not to receive such incentive based compensation based upon their own wrongful conduct, and thus they proximately caused and are continuing to cause substantial damage to the Company.

127.    As such, Pereira and Stanton are liable and must account to Riverstone for any and all incentive based compensation paid or to be paid to them unlawfully derived from their breaches of fiduciary duty.

- 44 -

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' wrongdoing as alleged in this Complaint;

B.    Determining and awarding Riverstone treble damages pursuant to California Corporations Code § 25502.5(a) for the Insider Selling Defendants' violations of California Corporations Code § 25402;

C.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Riverstone has an effective remedy;

D.    Awarding to Riverstone restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

E.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

VERIFIED FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

**JURY DEMAND**

2        Plaintiff demands a trial by jury.

3    DATED:  November 6, 2003

**RABIN, MURRAY & FRANK LLP**

*Eric J. Belfi*

Eric J. Belfi
275 Madison Avenue
New York, NY 10016
Telephone: (212) 682-1818
Facsimile: (212) 682-1892

John G. Emerson, Jr.
Scott E. Poynter
**EMERSON POYNTER LLP**
P.O. Box 164810
Little Rock, AR 72216-4810
Telephone: (501) 907-2555
Facsimile: (501) 907-2556

**DREHER LAW FIRM**
Robert Scott Dreher, SBN 120527
835 Fifth Avenue, Suite 202
San Diego, CA 92101
Telephone: (619) 230-8828
Facsimile: (619) 687-0136

Attorneys for Plaintiff

- 46 -

## VERIFICATION

I am the Plaintiff in this shareholder derivative action and I was a Riverstone shareholder during relevant times that the events alleged to have taken place in this Complaint occurred. Also, I continue to hold my shares. I believe the factual allegations in the Verified Amended Shareholder Derivative Complaint For Violation Of California Corporations Code, Breach Of Fiduciary Duty, Abuse Of Control, Gross Mismanagement, Waste Of Corporate Assets And Unjust Enrichment to be true based upon my own personal knowledge and my counsel's investigation. Having received a copy of this Complaint, having reviewed it with my Counsel, I hereby authorize its filing.