United States District Court
For the Northern District of California

**NOT FOR CITATION**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREGORY WATTERSON, Derivatively On Behalf of RIVERSTONE NETWORKS, INC., <br><br>   Plaintiff, <br><br>   v. <br><br> ROMULUS PEREIRA, et al., <br><br>   Defendants <br><br>   – and – <br><br> RIVERSTONE NETWORKS, INC., <br><br>   Nominal Defendant. <br> _____/ | No. C 03-0637 PJH <br><br> **ORDER GRANTING MOTION FOR FINAL APPROVAL OF DERIVATIVE SETTLEMENT** |

This matter came on for hearing on June 1, 2005, on the application of the parties for final approval of the settlement of this shareholder derivative suit, as set forth in the Stipulation and Agreement of Settlement dated November 12, 2004, and filed herein on December 17, 2004 ("the Stipulation"). Also before the court was the motion of objector Charles L. Grimes to intervene. Plaintiff Gregory Watterson appeared by his counsel Jeffrey D. Light and Brian J. Robbins. Defendants Romulus Pereira, Piyush Patel, Christopher Paisley, Eric Jaeger, Jorge A. Del Calvo, Robert Stanton, and Suresh Gopalakrishnan, and nominal defendant Riverstone Networks, Inc. ("Riverstone"), appeared by their counsel Paul T. Friedman and Craig D. Martin. Also appearing for Riverstone was Noah D. Mesel. Objector and proposed intervenor

Charles L. Grimes appeared by his counsel David A. Jenkins.

Due and adequate notice having been provided to the current Riverstone shareholders, as required by the court's order of February 16, 2005, and the court having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby GRANTS the motion for final approval of the derivative settlement, and GRANTS the motion to intervene, as follows and for the reasons stated at the hearing.

## BACKGROUND

After Riverstone announced disappointing financial results in June 2002, twelve complaints alleging violations of federal securities laws were filed in this court as proposed class actions. The twelve suits were consolidated on September 24, 2002, as In re Riverstone Networks, Inc., Securities Litigation. On March 14, 2003, defendants moved to dismiss the consolidated complaint for failure to state a claim. Briefing was completed on June 13, 2003, but the parties stipulated to continue the hearing to allow the parties to participate in mediation.

Meanwhile, on August 13, 2002, a shareholder derivative action was filed on behalf of Riverstone in the Superior Court of California, County of Santa Clara. (Bruhn v. Pereira, No. CV-810290). The allegations in the derivative suit were virtually identical to the allegations in one of the securities fraud complaints that had been filed in federal court the week before. In December 2002, the defendants in the derivative action demurred. Rather than oppose the demurrer, the plaintiff filed an amended complaint in February 2003.

Also in February 2003, Watterson v. Pereira, the above-entitled shareholder derivative action, was filed in this court. The allegations in the present suit are substantially identical to those of the original state court derivative complaint.

In April 2003, a second shareholder derivative action was filed in Santa Clara Superior Court (Carrico v. Pereira, No. CV-816188). The superior court consolidated the two actions as In re Riverstone Networks, Inc., Derivative Litigation, and in May 2003, plaintiffs filed a single consolidated shareholder derivative complaint. Defendants demurred. On September

1  17, 2003, the court sustained the demurrer and dismissed the consolidated complaint for
2  failure to allege demand futility.  Rather than granting leave to amend, however, the court
3  stayed the action, on the ground that the state court complaint and the complaint in the
4  derivative action pending in federal court encompassed the same issues.

5  Meanwhile, on April 25, 2003, Riverstone announced that it had received a request
6  from the SEC for the voluntary production of documents relating to the company's accounting
7  practices, and had been notified that the SEC would open a formal investigation.  On July 21,
8  2003, Riverstone announced that it had identified information calling into question the
9  appropriateness of its revenue recognition, and that it would restate its financial statements for
10  fiscal year 2002 and the first three quarters of 2003.

11  On September 26, 2003, defendants moved to dismiss the federal derivative
12  complaint, on the ground (among others) that plaintiff had failed to make a pre-litigation
13  demand on Riverstone's board and had failed to allege demand futility with particularity.
14  Shortly thereafter, plaintiff Watterson indicated his intention to file an amended complaint,
15  which he did on November 6, 2003, the motion to dismiss having been withdrawn.
16  Defendants again moved to dismiss, on March 26, 2004.  The parties stipulated to extend the
17  deadlines for briefing the motion, and then, in May 2004, requested a stay of the action so that
18  they could discuss settlement.

19  In October 2003, the parties had commenced mediation in an attempt to negotiate a
20  settlement of the claims raised in In re Riverstone Networks, Inc. Securities Litigation (the
21  securities fraud suit.)  On March 17, 2004, the parties reached an agreement in principle to
22  settle that suit.  At some point thereafter, they also reached agreement on a settlement of the
23  state and federal derivative actions, and the Stipulation of Settlement was signed on
24  November 12, 2004.

25  The Stipulation provided for a general release of claims by Riverstone shareholders on
26  behalf of Riverstone, and also provided that Riverstone would implement certain corporate
27  governance measures, described in the Stipulation at ¶ IV.2.1.  Riverstone also agreed "to
28  pay the fees and expenses (including, without limitation, the fees and expenses of all experts

3

retained by Derivative Plaintiffs' Counsel to assist in the Derivative Actions) of Derivative Plaintiffs' Counsel in an aggregate amount of $1,750,000 as a unitary part of the Settlement." Stipulation ¶ VI.B.  In addition, the plaintiffs in the state court derivative suit agreed to file a notice of dismissal in that case once the settlement agreement is approved by this court.

Defendants agreed to "cause the [D&O liability] insurers" to pay approximately $11 million "for the benefit of Riverstone in connection with the defense and settlement of" the Riverstone Securities Litigation.  Derivative plaintiffs (in the state and the federal actions) also assert that their counsel were "instrumental" in obtaining the $11 million from defendants' insurers for settlement of the securities fraud suit.  Other than "cause[ing] the insurers" to pay $11 million in towards the settlement of the securities fraud suit, the individual defendants are not contributing monetarily towards the settlement.

On December 2, 2004, the parties filed their application for preliminary approval of the derivative settlement.  At the initial hearing on January 20, 2005, the court stated that it was not prepared to grant preliminary approval, and ordered further briefing, providing the parties with specific issues that it wished to have addressed.  Plaintiffs[1] filed a supplemental brief on January 26, 2005.  Defendants did not file a brief.

On February 16, 2005, the court conducted a further hearing on the application for preliminary approval.  At that hearing, the court directed plaintiffs to provide additional supplemental briefing – specifically, to address the standard of law that applies to the court's evaluation of the request to approve the settlement.  The court noted that plaintiffs hadn't attempted to make a showing under the standard for approval of attorneys' fees requests, and that even under the more generous standard for approval of settlement agreements – that is, "fairness" – they still hadn't made any showing.

The court advised the parties that it had "real reservations," that it was "not satisfied with the showing," and that it was "not exactly sure what to do to resolve it."  The court also expressed dissatisfaction with the parties' failure to explain exactly which corporate

---

[1] The court refers throughout to "plaintiffs," as the Stipulation of Settlement was entered into by counsel for the derivative plaintiffs in the federal and state actions.

4

governance measures were implemented as a result of the settlement, and which were already in place before the settlement agreement. The court then indicated that it was willing to preliminarily approve, "mostly based on the approval by the board," but added that "<u>any</u> objections that I receive from any shareholders on this settlement will be scrutinized and could very well block final approval of the settlement." Following the hearing, the court signed the order preliminarily approving the settlement and providing for notice.

On May 2, 2005, Riverstone stockholder Charles L. Grimes filed a motion to intervene and also filed objections to the settlement – primarily, to the amount of attorneys' fees agreed to by the parties. During the week between May 17, 2005, and May 25, 2005, the parties filed additional briefs and declarations in support of the application for final approval of the settlement. On June 1, 2005, the court conducted a hearing on the application for final approval of the settlement.

At the June 1 hearing, plaintiffs argued that Mr. Grimes' motion to intervene should be denied; that the agreed-to fee was an appropriate and reasonable term of the settlement; and that plaintiffs had made a sufficient showing that they were entitled to the fee of $1.75 million.

Defendants argued that the settlement should be approved because it had been approved by the current Riverstone board of directors, two-thirds of whom had joined the board after the time of the wrongdoing alleged in the complaint. Defendants asserted that the board had decided to accept the settlement because they believed it would be in the corporation's best interest, in that continued litigation would be expensive, and a settlement would provide finality and allow the company to proceed with its usual business.

The court advised the parties that finding the settlement fair, reasonable, and adequate was difficult in view of the settlement term providing for payment of $1.75 million in fees to counsel for plaintiffs in both the state and federal actions. The court indicated, however, that it would approve the settlement, based primarily on the recommendation of Riverstone's board of directors, as articulated at the hearing and in the supporting papers by defendants' counsel Mr. Friedman. The court granted Mr. Grimes' motion to intervene, and invited him to appeal the final judgment.

**DISCUSSION**

A.  Legal Standard

Federal Rule of Civil Procedure 23.1 requires the district court to review and approve the settlement and dismissal of any shareholder derivative suit. Fed. R. Civ. P. 23.1 ("The action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal shall be given to shareholders or members in such manner as the court directs."). A similar rule applies in state court. See Fletcher v. A. J. Industries, Inc., 266 Cal. App. 2d 313, 324 (1968) (trial court in shareholder derivative action "is in a position to scrutinize the fairness of a settlement because the court alone can authorize the action's dismissal"). Before approving the settlement, the court must determine that it is "fundamentally fair, adequate, and reasonable." In re Pac. Enter. Sec. Litig., 47 F.3d 373, 377 (9th Cir. 1994).

In assessing whether the settlement of a derivative action is fair to the corporation and its shareholders, the court considers the same factors that are applied to class action settlements. Bell Atlantic Corp. v. Bolger, 2 F.3d 1304, 1311 (3d Cir. 1993); see also 7 Newberg on Class Actions (4th ed.) § 22:110. The court should determine whether the proponents of the settlement have shown that it fairly and adequately serves the interests of the corporation on whose behalf the action was instituted. Id.

This determination involves a balancing of several factors, which may include the strength of the plaintiff's case; the amount offered in settlement; the risk, expense, complexity, and likely duration of further litigation; the extent of discovery completed; and the possibility of collusion among counsel in negotiating the settlement. Churchill Village L.L.C. v. Gen'l Elec., 361 F.3d 566, 575-76 (9th Cir.), cert. denied, 125 S.Ct. 56 (2004); see also Officers for Justice v. Civ. Serv. Comm'n of San Francisco, 688 F.2d 615, 625 (9th Cir. 1982). It is the settlement taken as a whole, rather than the individual component parts, which must be examined for overall fairness. Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998). "The settlement must stand or fall in its entirety." Id.

B.  Analysis

    1.    Fairness Factors

        a.    strength of plaintiff Watterson's case

The state court sustained the demurrer to the consolidated derivative suit because plaintiffs had failed to make a pre-filing demand on Riverstone's board of directors, and had failed to sufficiently allege demand futility. The parties seeking preliminary approval of the settlement of the derivative actions agreed in the application that the <u>Watterson</u> case might similarly be subject to dismissal because Watterson had not made a pre-filing demand. Defendants argued in addition that Watterson failed to allege his claims with specificity, a requirement under the Federal Rules. Both sides also asserted that Watterson's odds of prevailing would be remote, because derivative suits are "rarely successful." This factor appears to favor settlement, because if plaintiff has no case, there is no point in continuing with the litigation.

        b.    the amount offered in settlement

This factor is not relevant, as no money is being offered in settlement of the derivative claims.[2] Rather, the Stipulation provides for implementation of new corporate governance procedures. It is difficult to assess the value of this benefit, even its non-pecuniary value, as the parties have never clarified which procedures were in place prior to the filing of the derivative suit, which procedures would have been implemented independent of the filing of the derivative suit, or which procedures were implemented after the Stipulation was executed or as a result of the settlement.[3]

The Stipulation states that "[d]uring the pendency of the Derivative Actions, Riverstone implemented, or began to make best efforts to implement by the end of 2004," the corporate governance procedures listed in the Stipulation. Stipulation ¶ IV.2.1. The Stipulation simply

---

[2] Some cases discuss the value of the benefit conferred on the corporation under this category. See, e.g., Rosenbaum v. MacAllister, 64 F.3d 1439, 1446 (10th Cir. 1995).

[3] The court made at least two requests for this information, but it was never forthcoming in any detail.

7

provides a list of corporate governance measures, and the parties offer no comparison between new procedures and old. Nor do plaintiffs provide expert testimony that clarifies the difference between the new and old procedures.[4] Moreover, based on the statements in the Stipulation, it appears that Riverstone may have implemented many if not all of the measures before the Stipulation was executed.

At the hearing on the application for preliminary approval of the settlement, the court also asked the parties to elaborate on the changes in corporate governance and the extent to which they were actually "changes." The court noted the lack of discussion (in the parties' papers) of the value of the changes, or of discussion of whether they were implemented after the settlement or were in progress before, or whether they were the result of the SEC action as opposed to the settlement.

In response, plaintiffs' counsel stated that the corporate governance provisions were negotiated during the mediation, and that some were the result of the derivative actions having been filed, while others were the result of settlement. Defendants' counsel stated that none of the changes resulted from the SEC investigation, that some resulted from the settlement, and that some were ongoing.

   c. the extent of discovery completed, and the risk, complexity, and likely duration of further litigation

There has been no discovery and no motions heard in the federal derivative action. Defendants argue that this factor favors settlement, as Riverside would have incurred substantial costs in connection with any formal discovery, and would have had to make numerous employees and former employees and board members available for deposition. They assert that the settlement allows Riverstone to avoid the expenses that can accompany protracted litigation. Defendants also contend that continued litigation would have distracted Riverstone's management from the business of running the company. Plaintiffs concur, noting

---

[4] Plaintiffs provided a declaration from California attorney Harry R. McCue, a retired United States Magistrate Judge, and from Scott D. Hakala, a Chartered Financial Analyst, both of whom state that in their opinion the changes in corporate governance procedures and internal controls provide significant value to the corporation.

8

that the settlement comes at an early stage of the litigation (of the present action), foreclosing the extraordinary expense of protracted discovery and trial preparation, and the incalculable cost of time and attention diverted away from the day-to-day business operations of the company.

Neither party comments directly on the likely duration of further litigation. This factor is difficult to assess, as there appears to be a conflict between the parties' assertion that Watterson's case was weak (therefore presumably vulnerable to dismissal under Rule 12(b)(6)) and their claim that settlement will enable the parties to avoid protracted litigation.[5]

        d.      possibility of collusion among counsel in negotiating the settlement

Both sides emphasize that the settlement negotiations were conducted at "arm's length," with the essential participation of the mediator, former United States District Judge Judge Charles A. Legge. The court is aware of no specific evidence of collusion.

        e.      "fairness factors" taken as a whole

Based solely on defendants' representations, the court finds that the agreement to implement changes in corporate governance confers a benefit on the corporation. In addition, the settlement undoubtedly relieves defendants from the expense of additional litigation, whatever the merit (or lack thereof) of Watterson's case. Taken together, the "fairness factors" favor approval of the settlement.

2.    Request for Attorneys' Fees

Although the provision for payment of attorneys' fees and costs is included as a term of the settlement agreement, the court addresses this factor separately in order to underscore its concerns regarding this method of structuring a settlement that is required by statute to be approved by the court.

---

[5] The court notes in addition that the derivative plaintiffs originally took the position (in their motion for preliminary approval of the settlement) that the litigation was risky because Watterson had failed to make a pre-litigation demand on Riverstone's board of directors, and because the case was likely to be dismissed for failure to allege demand futility with particularity, while they took the position in their supplemental briefing in support of the application for final approval that Watterson's case was meritorious and that he was likely to prevail in any motion to dismiss, and that approval of the settlement would therefore eliminate this potential for protracted litigation.

9

As stated above, the Stipulation provides that Riverstone shall pay attorneys' fees in the amount of $1.75 million to plaintiff's counsel.[6] Under the general rule in California and in most jurisdictions, the party prevailing in an action may not recover attorneys' fees unless a statute expressly permits such recovery. See, e.g. Cal. Civ. P. Code § 1021 (California expression of general rule); see also Hall v. Cole, 412 U.S. 1, 5 (1973) (general American Rule is that prevailing litigants must pay their own attorneys' fees).

An exception to this rule is found in the "common-fund doctrine," an equitable doctrine under which the beneficiaries of the fund pay their share of the expense necessary to make it available to them. Fletcher, 266 Cal. App. 2d at 320; see also Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980); Hall, 412 U.S. at 5 & n.7. Courts in California apply the common fund doctrine in favor of any plaintiff who has successfully maintained a stockholder's derivative action on behalf of a corporation in the state. Fletcher, 266 Cal. App. 2d at 320-21 (citing cases).[7]

In a "common fund" settlement, the parties settle for the total amount of the common fund and shift the fund to the court's supervision. The plaintiffs' lawyers then apply to the court for a fee award from the fund. Staton v. Boeing Co., 327 F.3d 938, 969-70 (9th Cir. 2003). The court evaluates the request for approval of settlement (under the factors identified in Hanlon and other cases) separately from the request for attorneys' fees.

A variant of the "common-fund doctrine" is the "substantial-benefit rule," where the successful plaintiff in a derivative action may be awarded attorneys' fees against the

---

[6] Five law firms are listed on the plaintiff's application for preliminary approval of settlement. Of these, three – the Murray firm, the Dreher firm, and the Emerson firm – are the counsel of record for plaintiff Watterson in Watterson v. Pereira. Two other firms – the Lerach firm (successor to Milberg Weiss) and the Robins Umeda firm – are counsel of record for the plaintiffs in the state court derivative suit; in addition, counsel for Watterson filed a "Notice of Association of Counsel" in May 2004, stating that plaintiff was associating in the Lerach and Robins Umeda firms.

[7] Riverstone is incorporated in Delaware, not California, and the general rule in diversity suits is that the law of the place of incorporation applies. See Batchelder v. Kawamoto, 147 F.3d 915, 920 (9th Cir. 1998). However, Watterson alleges claims under California law, and there are no significant differences between federal law and the law in Delaware and California on the issue of attorneys' fees. See Lewis v. Anderson, 692 F.2d 1267, 1270 (9th Cir. 1982); In re Oracle Sec. Litig., 852 F.Supp. 1437, 1445 (N.D. Cal. 1994).

corporation if the corporation received "substantial benefits" from the litigation, although the benefits were not pecuniary and the action did not produce a fund from which they might be paid. Fletcher, 266 Cal. App. 2d at 320, 324, cited with approval in Westside Cmty for Indep. Living, Inc. v. Obledo, 33 Cal. 3d 348, 352 (1983). Under California law, an agreement to implement improvements in corporate governance may provide a nonpecuniary "substantial benefit" to the corporation that is sufficient to entitle plaintiffs to an award of attorneys' fees. Fletcher, 266 Cal. App. 2d at 323-24.

It is irrelevant that the "benefits" achieved may have come from a settlement of the plaintiff's action rather than by a final judgment following trial. Id. at 325; Lewis, 692 F.2d at 1270 (both federal and California law permit a fee recovery when a substantial benefit arises from a settlement rather than a judgment). Federal law also permits a fee award if the benefit arises from corporate remedial action that moots a plaintiff's claim. Lewis, 692 F.2d at 1270.

In either a "common fund" or a "substantial benefit" case, the court can follow the "lodestar" approach, where the fee is determined based on the time and materials spent by derivative counsel. In re Oracle, 852 F.Supp. at 1449. In evaluating the lodestar, the court should consider any of the factors listed in Kerr v. Screen Extras Guild, Inc., 526 F.2d 67 (9th Cir. 1975) that are relevant.[8] The following factors are pertinent to a derivative counsel fee determination: the results achieved by counsel, plus the time and effort applied to a case by counsel for plaintiff; the relative complexities of the litigation; the skills applied to their resolution by counsel; and the standing and ability of petitioning counsel. In re Oracle, 852 F.Supp. at 1449.

At the hearing on the motion for preliminary approval of the settlement, the court asked the parties whether the agreement as to attorneys' fees was an element of the settlement agreement, or whether it was a separate agreement; and if it was part of the settlement agreement, whether the agreement would fail if the fees were not approved. Plaintiff's counsel indicated that the settlement was a unitary settlement, which would fail if the

---

[8] The Ninth Circuit does not require that district courts address every factor listed in Kerr. Jordan v. Multnomah County, 815 F.2d 1258, 1264 n.11 (9th Cir. 1987).

1 agreement to pay $1.75 million in fees was not approved as well.  The court discussed with
2 the parties its concerns that, if the fee agreement was included as a term of the settlement
3 agreement, there could be no separate basis for determining whether fees should be
4 awarded, and the same "fairness" factors would govern approval of the fees provision.

5       The court advised the parties that it was particularly troubled by the fact that they had
6 offered no explanation whatsoever of the basis for $1.75 million requested.  The court stated
7 further that it was impossible to perform a "reasonable fee" analysis based on a lodestar
8 calculation, as the application provided no information regarding hours, tasks performed, or
9 billing rates.  In the supplemental briefing that followed the second hearing on the motion for
10 preliminary approval of the settlement, plaintiffs' counsel finally provided the court with lodestar
11 documentation, though they still failed to address the Kerr factors.

12       Where fees are paid to attorneys in a shareholder derivative suit, the idea is that the
13 corporation has benefitted from the suit, and the cost of that benefit should be spread among
14 all the shareholders.  See James D. Cox & Thomas Lee Hazen, Cox & Hazen on
15 Corporations (2003) §15.20.  Throughout the settlement approval process, defendants have
16 urged the court to approve the settlement on the ground that Riverstone continued to lose
17 money as a consequence of the litigation, and that settlement would thus benefit the
18 corporation.  Defendants also asserted that if the litigation proceeded, Riverstone would likely
19 not have the assets to satisfy any judgment that plaintiffs might win.  According to defendants,
20 Riverstone's D&O insurers aggressively disputed their respective coverage obligations and
21 threatened rescission during the mediation.  Defendants asserted that Riverstone had
22 negotiated the settlement based on the assumption that it would have to fund it 100%,
23 although two of the three insurers eventually agreed to tender their policy limits.  In addition,
24 defendants noted that Riverstone's bondholders had sued the company seeking immediate
25 repayment of $131 million, casting further doubts on Riverstone's cash reserves.

26       By contrast, plaintiffs' counsel's only effort at briefing was to cite cases that stand
27 generally for the proposition that courts should approve settlement agreements, and that a
28 court presented with an application for approval of a settlement should not turn the application

into a "full-fledged hearing on the merits." Counsel also argued that because the economic value of non-pecuniary corporate therapeutic benefits can be difficult to precisely quantify, "an agreement on the parameters of a fee and expense award is particularly appropriate," and urged the court to approve the $1.75 million because it was "negotiated under market conditions."

In their supplemental brief in support of the application for preliminary approval of the settlement, plaintiffs' counsel again provided no explanation as to the asserted "reasonableness" of the $1.75 million fee request. Essentially, they asserted, just as in the initial brief filed in support of the application, that the court should approve the request simply because it was part of the parties' settlement agreement. Nor did they provide the information the court had requested concerning the changes in corporate governance. The only additions were three declarations – one from an economist, one from a retired magistrate judge, and one from plaintiffs' counsel Keith Park – purporting to explain why the settlement should be approved.

In the brief in support of the application for final approval of the settlement, plaintiffs argued, primarily, that the court should approve the fee provision because the amount was negotiated under "market conditions." In support of that proposition, they cited a wholly inapposite case – In re Continental Illinois Sec. Litig., 962 F.2d 566 (7th Cir. 1992). In that case, a securities fraud action which had settled for $45 million, the Seventh Circuit reversed the district court, which had cut the requested fees in half. Plaintiffs' counsel had sought the lodestar, supported by the usual documentation. The lodestar also amounted to 20% of the recovery. The district judge found the requested billing rates to be excessively high, and also reduced the amount in several other respects. The Seventh Circuit criticized the district court for placing a ceiling of $175/hour on the lawyers' hourly rates, and also (among other things) for refusing to allow paralegal expenses to be compensated at market rates, stating that the district court had made a mistake "by trying to determine the value of a service that the market has set its own value on" and noting that the Supreme Court has disapproved the approach of reimbursement for paralegal costs based on "cost" of the paralegal as distinct from the market

13

value of the services. Plaintiffs' counsel misleadingly cited this case for the proposition that "[i]t is inappropriate "to determine the value of a service that the market has set its own value on" by reference to hours or hourly rates, and it is error not to award a premium "in order to reflect the risky character" of representative litigation (citing In re Continental, 962 F.2d at 569).[9]

Plaintiffs' counsel argued further that the Supreme Court has stated that consensual resolution of attorneys' fees is the ideal toward which litigants should strive and that a request for attorneys' fees should not result in a second major litigation, citing Hensley v. Eckerhart, 461 U.S. 424 (1983). Hensley is not relevant here, as it involved a contested motion for attorneys' fees under 42 U.S.C. § 1988. The request in the present case is not contested. Moreover, settlement of civil rights cases does not require court approval or oversight, while settlement of shareholder suits does.

Plaintiffs' counsel provided three additional reasons that the court should approve the $1.75 million request: that the agreement regarding fees was the result of an arms'-length negotiation between sophisticated counsel, defendants, their insurers, and Judge Legge; that the settlement – including the $1.75 million fee – had been approved by Riverstone's board of directors as being in the best interests of the company; and that the agreed-to fee and expense provision is a "common settlement term" and is "consistent in amount with other derivative settlements."

In support of the third argument, plaintiffs provided copies of eleven orders they claimed were recent examples of court-approved derivative settlements that included an agreement as to fees and expenses as part of the settlement. Of those eleven cases, one was from a state court in Missouri, eight were from the Superior Court of California, and two were from the United States District Court (one from the Southern District of Texas, and one

---

[9] Even if the Continental decision were somehow relevant to this case – which it is not – the Ninth Circuit has criticized the Seventh Circuit's position that in awarding fees in common fund cases, courts should determine a reasonable fee by attempting to replicate the market rate. See Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1049 (9th Cir. 2002). Of course, plaintiffs' counsel is not asking this court in this case to attempt the replicate the market rate – but simply to approve the agreement to pay $1.75 million because it was negotiated under "market conditions."

14

from the Northern District of Georgia). None of the eleven opinions was a reported decision, and plaintiffs provided the court with no information about the underlying facts or the details of the settlements.

In short, apart from the persuasive arguments made by counsel for Riverstone, the court was presented with little reason to approve the award of $1.75 million in fees and expenses to plaintiffs' counsel.

### 3. Arguments by the Objector, Charles Grimes

The court received papers from one objector – Charles Grimes – a Riverstone stockholder with 3,500,000 shares. He objected primarily to the amount of the fee request, making several arguments in opposition to the motion for approval of the settlement.

First, he contended that it was improper for the settling parties to include an attorneys' fees provision as part of the settlement agreement, relying on the Ninth Circuit's recent decision in Staton v. Boeing Co.

Second, he asserted the suit was not meritorious, noting that the motion to dismiss would in all likelihood have been granted, because of the lack of pre-litigation demand.

Third, he claimed that there had been no showing by the parties that the settlement would result in a benefit to the corporation (primarily because the settlement required the changes in corporate governance to be in effect for only 4 years, and because plaintiffs had not shown any nexus between the derivative suit and the changes in corporate governance).

Finally, he argued that the amount requested is not reasonable – that the lodestar information submitted by plaintiffs' counsel provided no basis for measuring whether the fee was reasonable, that there was no evidence that derivative counsel had done much work other than copying the state court complaints. He asserted that the real reason the case had settled was probably a combination of the SEC investigation and the work done by plaintiffs' class counsel in the securities fraud suit.

Grimes also filed a motion to intervene in the action, for the purpose of preserving his right to appeal any adverse decision regarding his objection to the settlement (i.e., to the attorneys' fees provision in the settlement agreement). In support of his request, he cited an

unpublished decision, Karpp v. F.D.I.C., 921 F.2d 280, 1990 WL 212693 (9th Cir., Dec. 27, 1990), in which the Ninth Circuit found that the appellants lacked standing to appeal a class action settlement because they had opted out of the settlement class, and had made no effort to formally participate in the district court case, as, for example, moving to intervene.

The Ninth Circuit answered the question of the right of an objector to appeal the settlement of a class action Powers v. Eichen, 229 F.3d 1249 (9th Cir. 2000), a case brought under the Private Litigation Securities Reform Act. The court held that an unnamed class member who failed to intervene in the proceedings below had constitutional standing to appeal an award of attorneys' fees from the class settlement, because the size of his portion of the settlement award was inversely related to the size of the attorneys' fees award. Powers, 229 F.3d at 1254-56.

In 2002, in Devlin v. Scardelletti, 536 U.S. 1 (2002), the Supreme Court held that a "nonnamed class member" who objects in a timely fashion to a settlement may appeal without first intervening. Devlin, 536 U.S. at 14. The Court characterized the dispositive question as whether the class member should be considered a "party" for purposes of appealing the settlement, finding it most important that the settlement would bind nonnamed class members. Id. at 9-10.

However, this is not a class action, but a shareholder derivative action, in which there is no question of a shareholder being able to "opt out." It does not appear that the Ninth Circuit has ruled on this issue with regard to shareholder derivative suits. The court did note in the Powers decision that the Seventh Circuit was (at the time) the only circuit to rule that nonparty shareholders do not have standing to appeal a decision in a shareholder derivative suit. Powers, 229 F.3d at 1255 (citing Felzen v. Andreas, 134 F.3d 873 (7th Cir. 1998)[10] and also noting that both the Second and Third Circuits had allowed non-intervening unnamed parties to challenge the fairness and accuracy of a settlement in the context of Rule 23.1). In Bell

---

[10] The Ninth Circuit in Powers noted that the Supreme Court had granted certiorari in Felzen, and then simply affirmed by an equally divided court, without answering that particular question. Powers, 229 F.3d at 1255 (citing Cal. Pub. Employees' Retirement Sys. v. Felzen, 525 U.S. 315 (1999)).

16

Atlantic Corp. v. Bolger, the Third Circuit held that an objector who had not formally intervened had standing to appeal the order approving settlement of a derivative suit. Bell Atlantic, 2 F.3d at 1310. In Rosenbaum v. MacAllister, the Tenth Circuit ruled the same way. Rosenbaum, 64 F.3d at 1443.

Plaintiffs opposed the motion to intervene, arguing that because the corporation is the plaintiff in a derivative suit, any individual claims of the company's stockholders are not at stake and the shareholders are not parties. In support, they cited Jones v. H.F. Ahmanson & Co., 1 Cal. 3d 93 (1969). While it is true that the individual claims of the company's stockholders are not at issue in a derivative action, Jones does not provide support for plaintiffs' claim that the individual shareholders cannot challenge a settlement on behalf of the corporation, which is what Mr. Grimes is attempting to do here. Jones simply held that where the complaint of a minority stockholder in a savings and loan association against majority stockholders and a holding company did not seek recovery on behalf of the association for injuries to the association or for injury incidental to any injury to the association but for injury to herself and other minority stockholders, her suit was not derivative and could be maintained without meeting the statutory requisites of derivative actions and without showing that the injury was unique to her. Jones, 1 Cal. 3d at 106-07.

The court has carefully considered Mr. Grimes' persuasive objections, but has reluctantly determined, on balance, that the benefit to the corporation warrants approval of the settlement. The court does not agree that Staton prohibits inclusion of an attorneys' fees provision as a term in a unitary settlement agreement in a shareholder derivative action. In that case, the Ninth Circuit held that it was improper in the settlement of an employment discrimination class action for the class counsel to have negotiated, as a term of the settlement, the amount of fees to be paid from the common fund, instead of following the typical procedure of presenting a fee application to the court after approval of the class action settlement.

The Ninth Circuit acknowledged that the Supreme Court had held that parties to a class action may simultaneously negotiate merits relief and an award of attorneys' fees under a fee-

17

shifting statute, and might even condition the settlement on a waiver of fees. Staton, 327 F.3d at 971-72 (citing Evans v. Jeff D., 475 U.S. 717, 720 (1986)). However, the court added that the effect of conditioning the settlement "on a set amount of attorneys' fees based on an actual or putative common fund can be to inhibit district courts from engaging in independent determinations of reasonable fees, as required by law." Id. Moreover, the basis of the Ninth Circuit's objection to the settlement in Staton was that neither the parties nor the district court had applied correct statutory fee principles, and that it was improper to apply common fund fee principles where the parties had not treated the case as a common fund case. Id. at 969-72.

With regard to Mr. Grimes' claim that the suit was not meritorious, the court is unable to make a determination regarding the merit of the case without having had the benefit of briefing by the parties in a motion to dismiss. With regard to the argument that there is no showing that the settlement results in a benefit to the corporation, the court agrees that the showing is thin, but has accepted the representations of Riverstone's counsel that the current board of directors has concluded that the settlement is beneficial.

Finally, with regard to the claim that the $1.75 million fee request is not reasonable, the court agrees, but is unwilling to refuse to approve the fees provision because the result will be to invalidate the entire settlement agreement. The court notes, however, that the information provided by plaintiffs with their application for final approval of the settlement does not support their claim that a fee of $1.75 million is reasonable in this case. Plaintiffs have considered none of the Kerr factors, and the court has no basis upon which to determine whether the work performed was necessary or the time spent was reasonable.

Moreover, the $1.75 million less the claimed expenses of $38,347.20, equals $1,711,652.80, which represents a multiplier of 2.39 of the lodestar.[11] Plaintiffs have provided

---

[11] Plaintiff's counsel provide documentation showing that five law firms expended 1,850.90 hours, for a resulting lodestar of $716,180.50. The lodestar divided by the total hours equals an average of $386.94 per hour for every attorney, paralegal, and investigator. The $1.75 million fee, less claimed expenses, divided by the total hours equals an average of $924.77 for every attorney, paralegal, and investigator.

18

absolutely no valid justification for the application of a multiplier in this run-of-the-mill shareholder derivative action. Plaintiffs refer to the lodestar as "cross-check" – though it is not clear of what – and then breezily assert that the 2.39 multiplier is "reasonable" because the amount of the multiplier is "in line with" multipliers in other cases, without discussing the factors that courts normally consider when deciding whether to apply a multiplier.

Nevertheless, as stated at the hearing, the court finds that the motion to intervene should be GRANTED, primarily to ensure that Mr. Grimes is not prevented from appealing the approval of the settlement to the Ninth Circuit. The court would welcome guidance from the Ninth Circuit on the question of the propriety of unitary settlements in shareholder derivative actions, where the provision regarding payment of fees is a term of the settlement agreement; as well as on the question of the standard to be applied by the court in evaluating the fairness of such a settlement agreement that includes an attorneys' fees provision.

## CONCLUSION

This is a settlement that was carefully constructed by plaintiffs' counsel to evade judicial review. Moreover, even after the court requested additional information from the plaintiffs, the plaintiffs repeatedly failed to comply with those requests. The court determined to approve the settlement only because defendant's counsel, Mr. Friedman, was so persuasive in describing, at the hearings, the ways in which the corporation had made the best of a difficult choice, and the reasons that Riverstone's board of directors had determined that approval of the settlement would be the best thing in the long run for the corporation.

In accordance with the foregoing, and as stated at the June 1, 2005, hearing, the court hereby GRANTS the application for final approval of the settlement, and GRANTS the motion of objector Charles Grimes to intervene in this action.

**IT IS SO ORDERED.**

Dated: July 22, 2005

PHYLLIS J. HAMILTON
United States District Judge